# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-3891

_____

United States of America,     *
                             *

      Appellant,               *

                                  *    Appeal from the United States

v.                             *    District Court for the District of

                                  *    South Dakota.

Jerome Black Bear,          *

                                  *

      Appellee.               *

                                  *

_____

Submitted: June 21, 2005
Filed: September 1, 2005

_____

Before RILEY, BOWMAN, and BENTON, Circuit Judges.

_____

BENTON, Circuit Judge.

Jerome Albert Black Bear was indicted for assault causing serious bodily injury to his infant son, in violation of 18 U.S.C. §§ 1153 and 113(a)(6). Before the indictment, FBI agents questioned him four times.

On November 21, 2003, agent Miller spoke with Black Bear in a pediatric-intensive-care breakroom at the hospital, after treating doctors said that his son's fractured ribs "are consistent with intentional injury and are not consistent with accidental injury." Before the interview, the agent told Black Bear that he was not

under arrest, would not be arrested at the end of the interview, did not have to talk to the agent, and could end the interview at any time. Black Bear spoke with the agent, signing a (jointly) handwritten statement – all of which lasted about an hour.

On December 9, Black Bear was summoned and appeared in the Rosebud Sioux Tribal Children's Court for a (civil) preliminary hearing on temporary emergency custody. A public defender was appointed to represent him. After the hearing, a social worker from the South Dakota Department of Social Services called Black Bear back into the courtroom and "handmotioned" him to follow down a back hallway to the connected law-enforcement center. There, he met with FBI agent Allan D. Wipperfurth. Black Bear's public defender was not informed he was going to be questioned. Before the 30-minute interview, Wipperfurth told Black Bear that he was not under arrest, would not be arrested at the end of the interview, did not have to speak with Wipperfurth, and could end the interview at any time. Later in the day, Wipperfurth "asked" Black Bear to come in the next day – not as an optional appointment – for a polygraph examination at the county courthouse.

On the morning of December 10, Black Bear came to the courthouse without counsel. Upon arriving, he signed – between 10:17 and 10:21 am – a "consent to interview with polygraph" form in connection with "the physical abuse of a child," and a *Miranda* "advice of rights" form. Both agents present witnessed Black Bear's signatures on the two forms. Agent Trone alone administered the polygraph exam, and then questioned him further. Agent Wipperfurth re-entered the room at about 11:25 and asked more questions, with Trone present. Immediately before Wipperfurth's (and Trone's) post-exam questioning, Black Bear was *not* advised: that he was not under arrest, would not be arrested at the end of the interview, did not have to speak with them, and could stop talking at any time. Following Wipperfurth's questions, Black Bear agreed to provide a tape-recorded oral summary, which lasted from 12:10 to 12:16 pm. Black Bear left at 12:20 pm.

Later in the afternoon on December 10, Black Bear spoke with his public defender and returned home. About four hours after leaving the agents, he telephoned indicating he wanted to talk further. Wipperfurth and Trone drove to Black Bear's house, where the three talked inside Trone's vehicle for about 10 to 15 minutes.

Before trial, Black Bear moved to suppress all these statements, invoking the Fifth and Sixth Amendments. After a hearing pursuant to 28 U.S.C. § 636(b)(1)(B), the magistrate judge recommended denying the motion. The district court accepted the recommendation as to the November 21 hospital interview, the morning statements to Agent Trone on December 10, and the late-afternoon conversation on December 10. The district court suppressed the December 9 and December 10 statements to Wipperfurth – for violating the Fifth Amendment. The government appeals. Having jurisdiction under 18 U.S.C. § 3731, this court reverses.

The standard of review for suppression issues is two-pronged. *See **United States v. Sheikh***, 367 F.3d 756, 762 (8th Cir. 2004). This court reviews a district court's factual findings for clear error, and its legal conclusions de novo. ***Id.*** "In custody" determinations are independently reviewed on direct appeal. ***Id.***

I. Interrogation by agent Wipperfurth on December 9

When taken into custody for questioning, an individual must be advised of the rights to be free from compulsory self-incrimination, and to the assistance of counsel. ***Miranda v. Arizona***, 384 U.S. 436, 444 (1966). *Miranda* warnings are required only where a person is deemed to be in custody. ***Oregon v. Mathiason***, 429 U.S. 492, 495 (1977).

The ultimate inquiry to determine custody for *Miranda* purposes is whether there was a formal arrest, or restraint on freedom of movement of the degree

-3-

associated with a formal arrest. *California v. Beheler*, 463 U.S. 1121, 1125 (1983). This court first considers the totality of the circumstances of the historical facts that confronted Black Bear at the time of questioning. *See Thompson v. Keohane*, 516 U.S. 99, 112 (1995); *United States v. Czichray*, 378 F.3d 822, 826-28 (8th Cir. 2004). Second, the only relevant inquiry is whether reasonable persons in Black Bear's position would consider their freedom of movement restricted to the degree associated with a formal arrest. *See Berkemer v. McCarty*, 468 U.S. 420, 442 (1984); *Thompson*, 516 U.S. at 112. This determination is based on the objective circumstances, not on subjective views of the participants. *See United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004) (en banc).

The district court found that Black Bear "was ordered to attend the December 9 interview by Agent Wipperfurth acting through [social worker] Lanz." The court concluded that, from the perspective of a reasonable person, the restrictions on Black Bear were like those of a formal arrest. The court identified as key historical facts:

1. Lanz had considerable authority and power over Black Bear, having obtained an ex parte order removing his son to foster parents, and prosecuting the litigation (possibly) to terminate Black Bear's parental rights;
2. He directed Black Bear to meet with Wipperfurth, pursuant to Wipperfurth's advance directions;
3. Lanz ordered Black Bear to accompany him to be interviewed by Wipperfurth;
4. He did not give Black Bear the option of not coming; and
5. Black Bear was told the interview was "voluntary" only after he was in a private room of the police station.

These findings of fact are not clearly erroneous.[1]  However, the district court's legal conclusions are reviewed de novo, as is the ultimate determination of custody. The facts listed emphasize the events preceding the interview.  These facts do not resolve whether Black Bear was in custody during the interview of December 9.

The *LeBrun* case is instructive.  Before concluding that LeBrun was not in custody, this court considered the events preceding the interview.  ***LeBrun***, 363 F.3d at 718.  There, a Highway Patrol officer and a Naval investigator met LeBrun at his place of employment and asked him to accompany them to a Patrol office.  LeBrun was not informed of the subject of the investigation, nor given any warnings at that time.  LeBrun rode in a police car to the Patrol office, but was not restrained in any manner.  Upon arriving at the Patrol office, but before going inside, the investigator told LeBrun that he was not under arrest, was free to terminate the impending interview at any time, and was free to leave at any time.  ***Id.***

In this case, Wipperfurth made almost identical statements to Black Bear. True, in the events here, Black Bear may have faced more compulsion than LeBrun. However, "the coercive aspects of a police interview are largely irrelevant to the custody determination except where a reasonable person would perceive the coercion as restricting his or her freedom to depart."  ***Id.*** at 721.

---

[1]The magistrate judge made additional findings, which the district court did not directly address.  The district court disbelieved some of Wipperfurth's testimony, noting inconsistencies with Lanz's testimony.  The magistrate judge who actually saw and heard the witnesses (apparently) believed Wipperfurth, although the magistrate judge did not make credibility findings.  In this case, this court need not address the roles of the district court and magistrate judge relative to credibility determinations. *See* ***United States v. Ridgway***, 300 F.3d 1153, 1157 (9th Cir. 2002);  ***United States v. Cofield***, 272 F.3d 1303, 1306 (11th Cir. 2001).  The historical facts listed above are not clearly erroneous, but the issue here is the legal conclusion regarding custody.

The key is the reasonable person's view "during the interview" or "during the interrogation." *United States v. Wallace*, 323 F.3d 1109, 1113 (8th Cir. 2003); *United States v. Axsom*, 289 F.3d 496, 500 (8th Cir. 2002). Measured by the factors in *Axsom*, Black Bear was not in custody during the interview because:

1. He was informed at the time of his interview that he was not under arrest, would not be arrested at the end of the interview, did not have to speak with Wipperfurth, and could end the interview at any time;
2. While Black Bear did not have unrestrained freedom of movement during the interview because it occurred in a closed-door room in the police department, he nonetheless accompanied Wipperfurth to the room and was not handcuffed or restrained at any time during the interview;
3. Black Bear voluntarily acquiesced to Wipperfurth's requests to respond to questions;
4. No strong-arm tactics or deceptive strategies were employed during his interview;
5. While the atmosphere was police-dominated to some extent, it was not overly so to the point that Black Bear's freedom of movement was restrained to the degree associated with formal arrest; and
6. He was not placed under arrest at the termination of the interview.

*See Axsom*, 289 F.3d at 500 (quoting *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990)).

Because Black Bear was not in custody for the purposes of *Miranda*, the district court's order suppressing his statements on December 9 is reversed.

II. Post-examination questioning by agent Wipperfurth on December 10

The district court concluded that Black Bear was in custody on the morning of December 10 during the post-polygraph questioning. The court relied on the historical facts that Black Bear, after being ordered to the December 9 interview, was then ordered by Wipperfurth to return for the polygraph on December 10, and that the request for the exam was not an "optional appointment." The district court, acknowledging the *LeBrun* case, emphasized that Black Bear was not a repeat felon or otherwise familiar with FBI tactics or his Fifth Amendment rights.

The government attacks these factual findings, reiterating that the district court – without conducting an evidentiary hearing – disbelieved Wipperfurth's testimony that he told Black Bear the polygraph exam was voluntary (as he "always" does). This court again need not address the relative roles of the district court and magistrate judge, because the magistrate judge made a finding only as to an "agreed upon time" for the exam, mentioning nothing about other arrangements for it. The district court did not clearly err in its factual findings as to the December 10 questioning.

Based on these facts, the district court had "no doubt" that Black Bear's freedom to depart was restricted on December 10. Significantly, Black Bear was not told before the post-exam questioning on December 10: that he was not under arrest, would not be arrested at the end of the interview, did not have to speak with them, and could stop talking at any time. Based on a de novo review of the totality of these historical facts, this court agrees that Black Bear was in custody on the morning of December 10.

The government retreats to the position that proper warnings were given. The government has the burden of proving by a preponderance of the evidence that, under the particular facts and circumstances of the case, the waiver was an intentional,

voluntary, knowing, and intelligent relinquishment or abandonment of a known right or privilege. *See LeBrun*, 363 F.3d at 724.

At the outset of the polygraph exam on December 10 – between 10:17 and 10:21 am – Black Bear was advised of his *Miranda* rights, and waived them in writing. The "advice of rights" form plainly states the *Miranda* warnings, is not restricted, and was signed by both agents Trone and Wipperfurth. Black Bear also signed a (separate) consent to interview with polygraph. After the exam, agent Trone questioned Black Bear. Wipperfurth then re-entered the room and with Trone present, immediately interrogated Black Bear in the same room. Finally, with a tape-recorder on, both interviewed Black Bear, with Wipperfurth posing 20 questions, Trone next asking 7, and Wipperfurth concluding with 4 more. The district court admitted all the post-exam statements made to Trone, but suppressed those made to Wipperfurth.

The district court emphasized that Wipperfurth did not give any warnings when he re-entered the room to begin questioning at 11:25, and repeated the *Miranda* warning only when tape-recording began at 12:10. The district court concluded this was analogous and parallel to *Missouri v. Seibert*, __ U.S. __, 124 S.Ct. 2601 (2004). There, the defendant was given no warning of any kind until "midstream" – after she confessed during a continuous interrogation in the same room by the same officer who eventually gave the *Miranda* warnings. *Seibert*, 124 S.Ct. at 2605, 2606, 2612-13 (plurality opinion). The *Seibert* case is inapposite to this case, where *Miranda* warnings were given at the beginning of a continuous interrogation in the same room by the same officer who witnessed the warning at the outset.

The district court viewed the December 10 statements to Wipperfurth as a continuation of the unwarned statements to him on December 9. First, this view misinterprets the multifactor test of the *Seibert* plurality (assuming it applies to these facts). Black Bear's statements were separated by almost 24 hours, occurred in

different places, and involved an additional officer the second day; the first questioning was short (30 minutes); there was no cross-referencing overlap between the interrogations; and the agent did not treat the second day's as continuous with the first's. *See United States v. Fellers*, 397 F.3d 1090, 1098 (8th Cir. 2005); *United States v. Briones*, 390 F.3d 610, 614 n.3 (8th Cir. 2004); *United States v. Hernandez-Hernandez*, 384 F.3d 562, 566-67 (8th Cir. 2004); *United States v. Aguilar*, 384 F.3d 520, 524 (8th Cir. 2004). In addition, Black Bear was not under any police control (apparently returning home) during the nearly 24-hour break in questioning.

Second, the key to *Seibert* is whether the police officer's technique was a "designed," "deliberate," "intentional," or "calculated" circumvention of *Miranda*. *See Seibert*, 124 S.Ct. at 2614-16 (Kennedy, J., concurring in the judgment). *See generally Marks v. United States*, 430 U.S. 188, 193 (1977) (when no single rationale has the assent of five Justices, the holding is the position of the Justices who concurred in the judgment on the narrowest grounds). The district court did not make a legal conclusion of such intent as to the December 10 statements to Wipperfurth. Moreover, the district court did not conclude that there was "a deliberate strategy of staged interrogations" to circumvent *Miranda*. *See Fellers*, 397 F.3d at 1098; *Briones*, 390 F.3d at 614; *Hernandez-Hernandez*, 384 F.3d at 566; *Aguilar*, 384 F.3d at 525.

On a de novo review, the totality of the circumstances does not support such conclusions. Wipperfurth's questioning occurred in the same room, continuously after the (warned) polygraph and the (admissible) examining agent's questions. This case therefore is like those where after a (warned) polygraph exam, there is no per se requirement for *Miranda* warnings before (admissible) post-exam questioning. *See Wyrick v. Fields*, 459 U.S. 42, 48-49 (1982); *McDowell v. Leapley*, 984 F.2d 232, 234 (8th Cir. 1993); *Vassar v. Solem*, 763 F.2d 975, 978 (8th Cir. 1985); *United States v. Eagle Elk*, 711 F.2d 80, 83 (8th Cir. 1983).

Black Bear objects that in those cases, the polygraph examiner was apparently also the post-exam questioner – not another officer. Black Bear argues that this change is so serious that his answers no longer were voluntary, or he no longer was making a knowing and intelligent relinquishment of his rights. *See Wyrick*, 459 U.S. at 47; *Fields v. Wyrick*, 706 F.2d 879, 881 (8th Cir. 1983). To the contrary, the change in interrogator is not itself decisive. *See United States v. Gell-Iren*, 146 F.3d 827, 830-31 (10th Cir. 1998); *United States v. Andaverde*, 64 F.3d 1305, 1312-13 (9th Cir. 1995). This is not a case where the new interrogator had "nothing to do with the polygraph examination," as the district court here found that Wipperfurth had arranged the exam, ordered Black Bear to attend, and witnessed the *Miranda* and polygraph warnings. *See United States v. Gillyard*, 726 F.2d 1426, 1429 (9th Cir. 1984). Moreover, by ruling that post-exam statements to agent Trone were admissible, the district court found that Black Bear was sufficiently informed of the post-exam questioning. *See United States v. Leon-Delfis*, 203 F.3d 103, 109 (1st Cir. 2000).

This appeal presents no other issue of involuntariness as to the statements to agent Wipperfurth on December 10. *See LeBrun*, 363 F.3d at 724-27. Because required warnings were given, the district court's order suppressing Black Bear's statements to Wipperfurth after the polygraph exam on December 10 is reversed.

III.

The district court's order is reversed, and the case remanded.

_____