# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 08-1755

———————

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | Appeal from the United States |
| | * | District Court for the District |
| v. | * | of Minnesota. |
| | * | |
| Mohamad Elzahabi, | * | |
| | * | |
| Appellant. | * | |

———————

Submitted: November 11, 2008
Filed: March 5, 2009

———————

Before WOLLMAN, BEAM, and BENTON, Circuit Judges.

———————

BENTON, Circuit Judge.

A jury convicted Mohamad Kamal Elzahabi on three counts of knowingly possessing and using a fraudulently obtained immigration document in violation of 18 U.S.C. § 1546(a). The district court[1] sentenced him to time served and two years of supervised release. Elzahabi appeals, claiming that the court should have suppressed his incriminating statements, and that the evidence was insufficient. Jurisdiction being proper under 28 U.S.C. § 1291, this court affirms.

---

[1]The Honorable John R. Tunheim, United States District Judge for the District of Minnesota.

## I.

## A.

Elzahabi, a citizen of Lebanon, entered the United States in May 1984 on an F-1 student visa. He coordinated with a club manager to pay a performer $5,000 to marry him. After their marriage in 1984, they held a joint bank account, but never lived together or exchanged rings, and had sexual contact once, for which Elzahabi paid.

Elzahabi filed for permanent residency on April 3, 1986, based upon the marriage. At the time, the couple indicated they lived together and she had taken Elzahabi's last name. She later testified that this information was false. Elzahabi received a green card in June 1986 which he used three times during 2001 and 2002, resulting in the three counts charged.

## B.

In April 2004, the FBI, believing that Elzahabi was dangerous, began investigating his links with suspected terrorists. A police officer, Sergeant Andrew Smith, befriended Elzahabi. Elzahabi told Smith he was interested in obtaining U.S. citizenship. Smith offered to arrange a meeting with FBI agents to assist with his citizenship. Elzahabi agreed.

Elzahabi met with Smith and FBI agents Harry Samit and Chris O'Leary on the evening of April 16 to discuss citizenship. After preliminary discussion, the agents invited him to continue the interview at their field office, which Elzahabi accepted. Elzahabi and the agents arrived at the FBI office at about 1:00 a.m. on April 17. The agents informed Elzahabi that the interview was voluntary, that he did not have to continue speaking with them, and that he could change his mind at any time about talking to them.

The agents interviewed Elzahabi in the break room of the FBI office from 1:00 a.m. until 6:00 or 7:00 a.m. on April 17. The agents asked about his marriage. Elzahabi replied, "This is against me one-hundred percent. Let's put that aside." The agents immediately stopped questioning about the marriage, but continued the interview. At the end of the interview, the agents thanked Elzahabi for his cooperation, reminding him the interview was voluntary. The agents offered him the option of terminating the interview and going home, or staying at a hotel at the FBI's expense, with more interviews the next evening. Elzahabi accepted the second option. Two agents accompanied him at all times during his hotel stay.

The second interview occurred on April 17 between 7:00 p.m. and midnight. Before questioning, the agents informed Elzahabi that the interview was voluntary, that he could stop talking at any time, and that he had the right to an attorney if he desired. Elzahabi replied that he did not need an attorney, expressing eagerness to continue the interview.

The interviews continued until May 4. For all interviews after April 17, agents advised Elzahabi of his *Miranda* rights. On April 19 and May 3, he made incriminating statements about his marriage. On May 4, Elzahabi decided to terminate the interviews. The agents stopped the questioning, and released him. Later that day, Elzahabi was arrested by federal agents on an unrelated warrant.

II.

Before trial, Elzahabi moved to suppress statements he made during his interviews with the agents, arguing that their failure to give him *Miranda* warnings at the outset of questioning on April 17 rendered all his statements inadmissible. The

district court denied the motion, ruling that the agents had no obligation to give *Miranda* warnings because Elzahabi was not in custody.[2]

This court reviews for clear error a district court's factual determinations supporting a denial of a motion to suppress, and its conclusions of law, including the ultimate question of custody, de novo. ***United States v. Flores-Sandoval***, 474 F.3d 1142, 1144 (8th Cir. 2007); ***United States v. Ollie***, 442 F.3d 1135, 1137 (8th Cir. 2006). This court reverses a denial of a motion to suppress only if the decision "is unsupported by substantial evidence, based on an erroneous interpretation of applicable law, or, based on the entire record, it is clear a mistake was made." ***Flores-Sandoval***, 474 F.3d at 1144, *quoting **United States v. Harper***, 466 F.3d 634, 643 (8th Cir.2006).

A.

Law enforcement officials must administer *Miranda* warnings before interrogating individuals in their custody. ***United States v. Brave Heart***, 397 F.3d 1035, 1038 (8th Cir. 2005). An individual is in custody when placed under formal arrest, or when his or her freedom is restricted to a degree akin to formal arrest. ***Ollie***, 442 F.3d at 1137. Whether Elzahabi was in custody turns on whether, under the totality of the circumstances he faced at the time of his questioning, a reasonable person in his position would have felt free to end the interrogation and leave. *See **Brave Heart***, 397 F.3d at 1038-39.

In *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990), this court identified six factors to consider in determining whether an individual is in custody for the purposes of *Miranda*: (1) whether the suspect was informed that he or she was free to leave and that answering was voluntary; (2) whether the suspect possessed

---

[2]***United States v. Elzahabi***, 502 F. Supp. 2d 915 (D. Minn. 2007).

freedom of movement; (3) whether the suspect initiated contact or voluntarily acquiesced; (4) whether strong-arm tactics or strategies were employed; (5) whether the atmosphere was police-dominated; or, (6) whether the suspect was placed under arrest at the end of questioning. *Id.* These factors are not exclusive; custody "cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." *United States v. Czichray*, 378 F.3d 822, 827-28 (8th Cir. 2004). The "most obvious and effective means of demonstrating that a suspect has been taken into custody" is an express advisement that the suspect is not under arrest and that his participation in questioning is voluntary. *Brave Heart*, 397 F.3d at 1039, *quoting Griffin*, 922 F.2d at 1349.

The district court correctly held that the agents made clear to Elzahabi that he was free to leave the interview, and that his answering was voluntary. *See Ollie*, 442 F.3d at 1138. Before the first interview on April 17, the agents advised him that his participation was voluntary and that he could terminate the interview whenever he wished. The agents repeated this advice before questioning him again on the evening of April 17. An "explicit assertion that the defendant may end the encounter . . . . generally removes any custodial trappings from the questioning." *Id.* The district court properly concluded that the repeated and explicit advice by the agents weighed heavily toward a finding of non-custodial status.

Elzahabi counters that a reasonable person would not have felt free to terminate the April 17 interviews because they took place in the break room of the FBI field office. The critical inquiry is not whether the interview took place in a coercive environment, but rather whether the defendant's "freedom to depart was restricted in any way." *See United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004) (en banc), *quoting Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). Elzahabi presented no evidence that the agents restrained his freedom of movement during questioning. Where there is no clear indication that the defendant's freedom to depart is restricted, a police station interview is non-custodial. *Id.* at 723.

Elzahabi also contends that in determining custody, deceit should weigh heavily against the government. However, "the coercive aspects of a police interview are largely irrelevant to the custody determination except where a reasonable person would perceive the coercion as restricting his or her freedom to depart." *Id.* at 721. Elzahabi claims that deceit by Smith and the agents led him to believe that he was consulting FBI agents to discuss citizenship. As in *LeBrun*, whatever coercion existed in this case would not be perceived by a reasonable person as restricting his freedom to depart. *Id.* at 722. The agents repeatedly advised Elzahabi he was free to leave, they never physically restrained him, and never placed him in handcuffs. The district court correctly concluded that Elzahabi was not in custody on April 17.

B.

Elzahabi alternatively argues that the failure of the agents to advise him of his *Miranda* rights on April 17 tainted his subsequent *Mirandized* interviews, in violation of *Missouri v. Seibert*, 542 U.S. 600 (2004). *Seibert* requires that a court determine whether an officer's interrogation technique was a "designed," "deliberate," or "calculated" circumvention of *Miranda*. **United States v. Black Bear**, 422 F.3d 658, 664 (8th Cir. 2005), *citing* **Seibert**, 542 U.S. at 618 (Kennedy, J., concurring).

The totality of the circumstances does not support the conclusion that the FBI used a deliberate strategy of staged interrogations. *See* **Black Bear**, 422 F.3d at 664. The agents advised Elzahabi before each interview on April 17 that his participation was voluntary and that he could stop questioning at any time. Before the second interview, they added that he had the right to have an attorney present. Further, the only statements used at trial came several days after the non-*Mirandized* statements were made on April 17. *See id.* This court rejects Elzahabi's assertion that the FBI's failure to *Mirandize* him before the April 17 interviews tainted subsequent interrogations.

III.

Elzahabi claims that there was insufficient evidence to support a guilty verdict under § 1546(a). This court reviews the sufficiency of the evidence de novo, viewing the evidence in the light most favorable to the jury verdict and giving the verdict the benefit of all reasonable inferences. *United States v. Birdine*, 515 F.3d 842, 844 (8th Cir. 2008). This court reverses "only if no reasonable jury could have found the defendant[ ] guilty." *United States v. Johnson*, 450 F.3d 366, 372 (8th Cir. 2006).

Section 1546(a) makes it a crime to possess or use an alien registration receipt card, knowing it "to have been procured by means of any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained." **18 U.S.C. § 1546(a)**.

As in the district court,[3] Elzahabi argues that the evidence was insufficient because the prosecution failed to prove that his marriage was invalid. In *Lutwak v. United States*, the Court considered convictions for conspiring to commit immigration fraud in violation of § 1546. The Court upheld their convictions despite the formal validity of the marriages:

> "We do not believe that the validity of the marriages is material. No one is being prosecuted for an offense against the marital relation. . . . [W]hen one of the aliens stated that he was married, and omitted to explain the true nature of his marital relationship, his statement did, and was intended to, carry with it implications of a state of facts which were not in fact true."

344 U.S. 604, 611-12 (1953).

---

[3]*United States v. Elzahabi*, 517 F. Supp. 2d 1121 (D. Minn. 2007).

-7-

Elzahabi relies on two cases distinguishing *Lutwak*.  *See **United States v. Diogo***, 320 F.2d 898, 905 (2d Cir. 1963); ***United States v. Lozano***, 511 F.2d 1, 5-6 (7th Cir. 1975).  The *Diogo* court recognized *Lutwak*, but reasoned that § 1546 encompassed two distinct offenses – concealment of a material fact and false representation.  320 F.2d at 902.  According to the *Diogo* majority, *Lutwak* prohibited considering the validity of the marriage only where the charges alleged concealment of a material fact.  ***Id***. at 904.  On the false representation charges before it, the *Diogo* court reversed the convictions because the prosecution "failed . . . to sustain its burden of [ ] proving that the marriages were void at the time appellant's representations concerning the marital status were made."  ***Id***. at 909; *see also **Lozano***, 511 F.2d at 5 ("[W]e choose to follow the reasoning of the Second Circuit [in *Diogo*] and to vacate the judgment and sentence on [the false statement] counts.").

Other courts have questioned *Diogo*'s reasoning.  *See **United States v. Yum***, 776 F.2d 490 n.2 (4th Cir. 1985) ("We reject the reasoning of [*Diogo* and *Lozano*] and follow that of the Supreme Court in *Lutwak*."); ***United States v. Bolden***, 23 M.J. 852, 854-55 (A.F.C.M.R. 1987) (following the *Diogo* dissent and *Yum*), *aff'd* 28 M.J. 127 (C.M.A. 1989); *cf.* ***Diogo***, 320 F.2d at 909 (Clark, J., dissenting).

The *Lutwak* court favorably discussed *United States v. Rubenstein*, 151 F.2d 915 (2d Cir. 1945).  344 U.S. at 612-13.  In that case, the Second Circuit upheld a conviction of conspiring to bring an alien into the country by false representations, false documents, and concealment of material facts, even though the marriage was valid.[4]  ***Rubenstein***, 151 F.2d at 918.  Neither *Lutwak* nor *Rubenstein* draws a distinction between false representation and concealment charges.

---

[4]The defendant in *Rubenstein* was convicted under 8 U.S.C. § 220(c), the precursor to 18 U.S.C. § 1546.  *See **Lutwak***, 344 U.S. at 608.

This court need not choose among the circuits because the present case is a concealment offense not distinguishable from *Lutwak*. *See **Diogo***, 320 F.2d at 903 ("It is conceded by the Government that the basic substantive offense with which the present indictment charges each of the appellants is that of making false representations with respect to his marital statute."); ***Lozano***, 511 F.2d at 5 ("[T]hese indictments turn on whether it was a false statement to say that petitioner was married . . . ."). In the present case, Elzahabi was indicted and prosecuted on a concealment charge. *See **United States v. Pantelopoulos***, 336 F.2d 421, 424 (2d Cir. 1964) (following *Lutwak* where "[u]nlike *United States v. Diogo*, there was no charge in this case that the conspirators had falsely represented the alien's marital status."). The government presented evidence at trial that Elzahabi obtained his green card by concealing the nature of his marriage. The government established that he then used his green card three times during 2001 and 2002. A reasonable juror could conclude that there was sufficient evidence to find Elzahabi guilty beyond a reasonable doubt. *See **United States v. Amahia***, 825 F.2s 177, 182 (8th Cir. 1987) (rejecting an insufficiency claim where the defendant entered a sham marriage and lied to INS agents).

Elzahabi also argues that his marriage was statutorily legal in 1984, before the Immigration Marriage Fraud Amendments of 1986 were enacted. *See* **Pub. L. No. 89-236, 79 Stat. 911 (October 3, 1965); Pub. L. 99-639, 100 Stat. 3537 (Nov. 10, 1986)**. While the 1986 amendments did change certain provisions in immigration law, they did not change the language or elements of § 1546. Upholding the defendants' convictions in *Lutwak*, the Court stated in 1953 that "Congress did not intend to provide aliens with an easy means of circumventing [its] system by fake marriages in which neither of the parties ever intended to enter into the marital relationship." 344 U.S. at 611.

Elzahabi next challenges the denial of his jury instruction defining marriage consistent with *Diogo* and *Lozano*. A defendant is entitled to a theory-of-defense

instruction that is timely requested, supported by the evidence, and correctly states the law. ***United States v. Claxton***, 276 F.3d 420, 423 (8th Cir. 2002). This court concludes that *Diogo* and *Lozano* do not completely state the law for this case. The district court committed no error in denying the instruction. *See **United States v. Johnson***, 278 F.3d 749, 752 (8th Cir. 2002) (affirming jury instructions if, as a whole, they "fairly and adequately submitted the issues to the jury").

IV.

The judgment of the district court is affirmed.

_____