# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

————————

No. 09-3450

————————

United States of America,

    Appellee,

  v.

Timmy Nathan Johnson,

    Appellant.

     Appeal from the United States
     District Court for the
     Eastern District of Missouri.

     [PUBLISHED]

————————

Submitted: June 16, 2010
Filed: August 30, 2010

————————

Before MELLOY, HANSEN, and SMITH, Circuit Judges.

————————

HANSEN, Circuit Judge.

Following a jury trial, Timmy Nathan Johnson was convicted of one count of conspiracy to distribute 500 grams or more of a mixture containing methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846 and 21 U.S.C. § 841(b)(1)(A)(viii), one count of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i), and two counts of being a prohibited person in possession of firearms, in violation of 18 U.S.C. § 922(g)(1). The district court[1] determined that Johnson was responsible for decidedly

---

[1]The Honorable Rodney W. Sippel, United States District Judge for the Eastern District of Missouri.

more than 15 kilograms of methamphetamine and assessed a two-level increase for being a leader or organizer in the conspiracy. The district court sentenced Johnson to 360 months' imprisonment. Johnson appeals, arguing that the district court erred in denying his pretrial motion to suppress evidence, in denying his motion for a directed verdict of acquittal, in determining the drug quantity, in assessing a two-level increase for his role in the offense, and in failing to give proper weight to his age and status as a drug addict in determining the sentence. For the following reasons, we affirm.

I.

Following Jesus Contreras's conviction and sentencing for drug dealing in 2004, his wife, Myrna Contreras, took over her husband's illegal drug dealing operation. At Johnson's trial, Myrna testified that she dealt drugs and collected money for Jesus's boss in the methamphetamine business. She also oversaw the delivery of methamphetamine and handled drug proceeds. She oversaw drug shipments of typically one to two pounds of methamphetamine to Johnson's house approximately once or twice a month from the end of 2004 until early 2008. The drugs would then be distributed throughout the organization. Johnson often paid Myrna in cash for the drugs, but she also set up a special account in which Johnson could deposit the money for the drugs.

Jimmy George testified that he met Johnson at the home of Jack Burgess, another member of the drug organization, one day when Shawn Montgomery, another conspirator, arrived with a shipment of methamphetamine. George testified that he sold methamphetamine to Johnson two or three times when Johnson ran out. George also testified that he had seen Myrna at Johnson's house with methamphetamine.

Shawn Montgomery testified that he had also met Johnson at Burgess's home and that he had delivered a half pound of methamphetamine to Johnson on at least

three separate occasions. Montgomery also testified that he had collected money from Johnson for the sale of the methamphetamine.

Victor Thomason, another member of the organization, testified that he had delivered methamphetamine to Johnson under the orders of Jesus Contreras and had picked up approximately $6,000 of drug money from Johnson to give to Jesus. Thomason had also picked up methamphetamine from Johnson one or two times.

Ken Grady testified that in 2003 or 2004 he was interested in becoming involved in the drug business and was introduced to Johnson as someone to speak with if he wanted to deal drugs. Johnson agreed to assist Grady and provided him with methamphetamine to sell. Johnson provided Grady with methamphetamine every one to two weeks for six to seven months, starting with smaller amounts of around 3.5 grams and eventually providing up to approximately 110 to 140 grams.

At trial, the Government presented evidence that various members of the conspiracy deposited proceeds from the sale of methamphetamine into bank accounts maintained by Myrna at Bank of America. Myrna testified that she initially delivered the money from the account to the "provider" in New Mexico and eventually to her husband in Mexico after he had been released from prison. (Trial Tr. Vol. II at 77.) Myrna provided the account information to members of the conspiracy so they could deposit the proceeds from the sale of the methamphetamine, and informed the members of the conspiracy, including Johnson, not to make deposits over $10,000 because of reporting requirements.

At trial, Myrna identified Government's Exhibit 9 as a deposit form for her Bank of America account from June 28, 2005, when Johnson was making deposits to pay for methamphetamine. The deposit was for $9,000, which she testified was a "typical amount that would be deposited." (Trial Tr. Vol. II at 85.) Myrna testified that Johnson would typically call her and tell her when he was going to make a deposit

and that he made deposits on more than six occasions. The other members of the conspiracy testified that they had made similar deposits into the Bank of America accounts. George testified that he had made a couple of deposits; Montgomery testified that he made deposits three to six times; Thomason testified that he had made wire transfers into the account.

The Government offered the testimony of Eric Neeley, who worked for Bank of America as a banking center manager for three and a half years and had been in the banking industry for approximately ten years total. Neeley identified Government's Exhibit 9 as a deposit ticket from Bank of America that was made at or near the time of the deposit kept as part of the course of regularly conducted business activity at the bank. The deposit ticket bore the name "Tim Johnson" and had a Missouri driver's license number, which Neeley testified would have been put on by the teller at the time of the deposit and could not have been added later because the records were kept electronically. Johnson stipulated that the number on Exhibit 9 was his Missouri driver's license number in 2005. Neeley testified that it was the bank's policy for tellers to take identification from non-account holders making deposits into Bank of America accounts and record the depositor's name and identification information on the deposit ticket.

On June 27, 2008, Drug Enforcement Administration (DEA) Special Agent Bernie Gard, Missouri State Highway Patrol Sergeant Mark McClendon, and Bootheel Area Drug Task Force Officer Marcus Hopkins went to Johnson's home to conduct what is referred to as a "knock and talk" interview, in which officers go to the door of someone suspected of drug activity, knock on the door, identify themselves as officers, and ask if they can enter the home and discuss drug activity they have heard about. When they knocked at Johnson's home, they introduced themselves and asked if they could speak to him. Johnson invited the officers into his home, and Special Agent Gard informed Johnson that he was not under arrest, that he did not have to speak with the officers, and that he could ask the officers to leave if he did not wish

to answer questions. Johnson agreed to speak with the officers and made statements implicating himself in the use and distribution of methamphetamine. Johnson stated that he had known Myrna and Jesus Contreras for several years, that he was a regular user of methamphetamine, and that he had "cut," which is a substance narcotics dealers add "to make a quantity of methamphetamine . . . look larger" for purposes of resale. (Evidentiary Hearing Tr. at 23.) At the start of the interview, Johnson was wearing only underwear. Shortly after the interview began, Johnson asked to put on pants, and the officers agreed after making sure there were no weapons in the pants.

Immediately upon entering the home, Sergeant McClendon observed a handgun on the kitchen counter. After speaking with Johnson, the officers searched, with Johnson's permission, Johnson's residence, a shop building, and a vehicle on the premises. They located a set of digital scales containing methamphetamine residue, a black vinyl bag with baggies and a pipe in it, more glass pipes, a rifle, and ammunition.

Special Agent Gard testified at an evidentiary hearing that Johnson never tried to revoke his consent to search, never attempted to limit his consent to search, never requested to speak to an attorney, never asked the officers to leave, and was allowed to use the telephone. According to Special Agent Gard's testimony, Johnson did not appear to be intoxicated or under the influence of drugs or alcohol, did not appear to be ill, did not seem to have difficulty in understanding the officers, and was not threatened.

During the officers' time at Johnson's residence, his phone rang. Johnson answered the phone and said that it was his girlfriend. He then asked the officers to leave because he was afraid his girlfriend would know who they were but requested to meet with the officers again at a later time. Based on this request for a second meeting, he came to the Dunklin County Justice Center on June 30, 2008, and met with Sergeant McClendon and Officer Hopkins. Johnson was advised that he did not

have to speak with officers and that he was free to leave at any time. He told the officers that he had obtained small quantities of drugs from Myrna Contreras. Johnson never attempted to stop the interview, never requested to speak with an attorney, was not forced to speak with the officers, and was not threatened by the officers.

Johnson was indicted and charged with conspiracy to distribute 500 grams or more of a substance containing methamphetamine. Johnson filed a pretrial motion seeking to suppress physical evidence and statements he made during the knock and talk interview on June 27 and the interview on June 30. The magistrate judge[2] issued a report and recommendation recommending the motion be denied. Johnson filed an objection to the report, and the district court denied the objection, accepted the report, and denied the motion to suppress the evidence. A superseding indictment was issued adding two counts of money laundering, one count of possession of a firearm by a felon, and one count of possession of a firearm by an unlawful user of drugs. Johnson was tried by a jury, and at the end of the Government's case-in-chief, he filed a motion for judgment of acquittal, which the district court denied. At the end of the trial, Johnson was found guilty on the count of conspiracy to distribute, on one of the counts of money laundering, on the count of being a felon in possession of a firearm, and on the count of being an unlawful user of drugs in possession of a firearm. He was found not guilty on one of the money laundering counts.

Following Johnson's conviction, the United States Probation Office prepared a Presentence Investigation Report (PSR). The PSR recommended that Johnson be held responsible for distributing approximately 41 kilograms of methamphetamine, depositing $9,000 in drug proceeds, and possessing two loaded firearms. The PSR calculated a base offense level of 38 based on United States Sentencing Guidelines

_____

[2]The Honorable Lewis M. Blanton, United States Magistrate Judge for the Eastern District of Missouri.

(U.S.S.G.) Manual § 2D1.1(c)(1), added two levels for possession of the firearms under U.S.S.G. § 2D1.1(b)(1), added two levels because the offense involved the importation of methamphetamine under U.S.S.G. § 2D1.1(b)(4), and added two levels for Johnson's role as an organizer, leader, manager, or supervisor in the offense under U.S.S.G. § 3B1.1(c), leading to a recommended total offense level of 44. The PSR calculated a criminal history category of III, which resulted in a total advisory guidelines range of life in prison.

Johnson filed objections to the PSR, contesting, among other things, the drug quantity calculation and the two-level increase for his role in the offense. At the sentencing hearing, the district court heard argument and overruled Johnson's objections. The district court varied downward and imposed a sentence of 360 months' imprisonment on the conspiracy to distribute count, 240 months' imprisonment on the money laundering count, and 120 months' imprisonment for the firearm counts, to be served concurrently. At the sentencing hearing, the Government moved to dismiss the count of being an unlawful user of a controlled substance in possession of a firearm, as both firearm charges arose from the same act of possession.

Johnson appeals his conviction and sentence.

## II.

Johnson argues that: (1) the district court erred in denying his motion to suppress; (2) the district court erred in denying his motion for judgment of acquittal as to the money laundering count; and (3) the district court abused its discretion in sentencing.

Johnson argues that the district court erred in denying his motion to suppress the evidence and the statements made at the knock and talk interview on June 27 and the interview at the police station on June 30 because the police lacked a warrant to search his home and he was not given Miranda[3] warnings at either of the interviews.

We review a district court's factual findings for clear error and legal conclusions *de novo* when reviewing the denial of a motion to suppress. United States v. Manes, 603 F.3d 451, 455 (8th Cir. 2010). "'We must affirm . . . unless the decision is unsupported by substantial evidence, is based on an erroneous view of the applicable law, or in light of the entire record, we are left with a firm and definite conviction that a mistake has been made.'" Id. at 455-56 (quoting United States v. Rodriguez-Hernandez, 353 F.3d 632, 635 (8th Cir. 2003)) (alteration in original).

Johnson argues first that the consent he gave to search his residence, shed, and vehicle was not voluntarily given. "The voluntariness of a consent to search is a factual question that is reviewed for clear error." United States v. Saenz, 474 F.3d 1132, 1136 (8th Cir. 2007). Consent may be given orally, and Miranda warnings are not required for consent to be considered voluntarily given. Id. at 1136-37.

To determine whether consent was given voluntarily, we examine the totality of the circumstances. Id. at 1137. We consider (1) Johnson's age; (2) his general intelligence and education; (3) whether he was intoxicated at the time; (4) whether he was informed of his Miranda rights before consenting; (5) whether any previous arrests would have informed him of his rights and protections; (6) the length of time he was detained; (7) whether the officers acted in a threatening manner; (8) whether the police made any promises or misrepresentations; (9) whether the police had

---

[3]Miranda v. Arizona, 384 U.S. 436 (1966).

Johnson in custody or under arrest at the time; (10) whether he consented in public; and (11) whether Johnson was silent during the search. Id.

At the time of the search, Johnson was in his late forties, was a high school graduate, and did not appear to be intoxicated or under the influence of drugs or alcohol. He did not receive a Miranda warning, but he had been previously arrested and convicted of various other crimes throughout the previous decade. There was no evidence that the officers acted in a threatening manner or that they made any promises or misrepresentations to Johnson. Johnson was not in custody or under arrest when he consented to the search. He was not in public, but he was in his home into which he had invited the officers. Johnson did not object during the search; Agent Gard stated that Johnson was "very patient" with the officers during the search, and he even identified the substance seized as cut for methamphetamine. (Evidentiary Hearing Tr. at 25.) The officers spoke with Johnson for approximately five to ten minutes before they requested consent to search the residence and shop. They spent approximately thirty minutes searching the residence and another fifteen to twenty minutes searching the shop.

Johnson asserts that the fact that he was at first wearing only his underwear and later asked permission to put on pants demonstrates that he felt intimidated such that he did not feel he could ask the officers to leave his home or refuse to consent to the search. However, Johnson chose to open the door when he was not fully clothed, and when he indicated that he wanted to put on pants, the officers made no attempt to stop him. Moreover, Johnson felt free to answer his telephone and speak to his girlfriend and then asked the officers to leave. The officers complied with his request and left his residence. Considering the totality of the circumstances, the district court did not clearly err in determining that Johnson voluntarily consented to the search. See Saenz, 474 F.3d at 1137.

Johnson next argues that the officers should have advised him of his Miranda rights before interviewing him both in his home and at the police station. Miranda v. Arizona requires that an individual be read certain warnings before being subject to "custodial interrogation." 384 U.S. at 444. If an individual is not subjected to custodial interrogation, no warning need be given. See, e.g., Illinois v. Perkins, 496 U.S. 292, 296-97 (1990) (holding that an undercover officer need not give a Miranda warning to an incarcerated suspect because there is no custodial interrogation from an undercover officer). "A custodial interrogation is defined as 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way.'" United States v. Flores-Sandoval, 474 F.3d 1142, 1146 (8th Cir. 2007) (quoting Maine v. Thibodeau, 475 U.S. 1144, 1146 (1986)). "'The ultimate inquiry . . . is whether there was a formal arrest, or restraint on freedom of movement of the degree associated with a formal arrest.'" Id. (quoting United States v. Black Bear, 422 F.3d 658, 661 (8th Cir. 2005)). To make this determination, we must first consider the totality of the circumstances and then decide "whether a reasonable person in his position would consider his 'freedom of movement restricted to the degree associated with formal arrest.'" Id. (quoting United States v. Czichray, 378 F.3d 822, 826 (8th Cir. 2004), cert. denied, 544 U.S. 1060 (2005)). We make our determination based on the objective facts, not Johnson's subjective views. Id.

We have previously explained that, although these factors are not exclusive, factors that would indicate custody are: (1) whether the officers informed Johnson he was free to leave and not required to answer any questions; (2) whether Johnson "possessed freedom of movement;" (3) whether Johnson initiated the contact with the officers or voluntarily acquiesced; (4) whether the officers employed strong arm tactics or strategies; (5) whether "the atmosphere was police dominated;" and (6) whether the officers arrested Johnson at the end of the interview. Id. at 1146-47.

-10-

During both interviews, officers informed Johnson that he was not required to answer any questions. During the June 27 interview at Johnson's residence, the officers informed him that he could ask them to leave at any time (and he eventually did so and the officers left), and during the June 30 interview at the police station, the officers informed him that he was free to leave at any time. Johnson's freedom of movement was not restricted, and he was continuously observed by an officer at his home because there was a firearm on the kitchen counter. Johnson voluntarily acquiesced to the first interview at his home, and he initiated the second interview when he told officers that he wanted to speak with the officers again. There is no evidence that the officers employed strong arm tactics or strategies, and there is no evidence that the atmosphere was police dominated. Finally, Johnson was not arrested at the conclusion of either interview. Therefore, evaluating the factors that indicate custody, we are compelled to conclude that Johnson was not in custody and was not subject to "custodial interrogation" such that a <u>Miranda</u> warning was required. See <u>Miranda</u>, 384 U.S. at 444.

Accordingly, because Johnson voluntarily consented to the search, <u>see</u> <u>Manes</u>, 603 F.3d at 455, and because Johnson was not entitled to a <u>Miranda</u> warning, <u>see</u> <u>Miranda</u>, 384 U.S. at 444, there was no error in denying Johnson's motion to suppress.

B.

Second, Johnson argues that the district court erred in denying his motion for judgment of acquittal on the money laundering count of which he was convicted. "We review the denial of a motion for a judgment of acquittal *de novo*." <u>United States v. El Herman</u>, 583 F.3d 576, 579 (8th Cir. 2009). "We will affirm if, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" <u>Id.</u> (quoting <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979)).

The Government presented testimony that the conspirators deposited the money from the methamphetamine sales into the Bank of America account. Myrna Contreras testified that she gave Johnson the account number, that she told him to deposit the money into the account, and that he called her to inform her that he would be making a deposit before he did so. Although Myrna did not recall the specific date, she identified the deposit slip dated June 28, 2005, labeled Government's Exhibit 9 as a deposit into her account. She testified that the only purpose for the account was for people to pay for methamphetamine and that they did no legitimate business together so any money he ever paid her would have been for methamphetamine.

Myrna also testified that Johnson was depositing money in June of 2005, and Eric Neeley testified that Government's Exhibit 9 identified that the deposit was made by a Tim Johnson with the same Missouri driver's license number as the defendant Johnson. The mark identifying Johnson on the deposit slip could not have been added later, and the bank's policy at the time of the deposit was that the teller would have made the notation identifying Johnson at the time of the deposit.

Given the testimony the Government presented regarding the Bank of America account and the deposit slip identified as Government's Exhibit 9, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime of money laundering beyond a reasonable doubt. Therefore, the district court did not err in denying Johnson's motion for a judgment of acquittal as to the money laundering count of which Johnson was convicted. See El Herman, 583 F.3d at 579. We note, in passing, that Johnson was acquitted by the jury of the other money laundering count, the proof of which did not contain a deposit slip with Johnson's driver's license number.

C.

Finally, Johnson challenges his sentence, arguing that the sentence was procedurally unreasonable because the district court erred in calculating the amount of drugs attributable to him and erred in imposing a two-level increase for his role in the offense. Johnson also argues that the district court abused its discretion in imposing a substantively unreasonable sentence because it failed to consider certain mitigating factors.

We review a sentence for reasonableness, "applying the 'familiar abuse-of-discretion standard.'" United States v. Johnson, 572 F.3d 449, 454 (8th Cir.) (quoting Gall v. United States, 552 U.S. 38, 46 (2007)), cert. denied, 130 S. Ct. 569 (2009). First, we must review the sentence for a significant procedural error and then, if there is no significant procedural error, we review the sentence for substantive reasonableness. See id. Procedural errors include "'failing to calculate (or improperly calculating) the Guidelines range, . . . [or] selecting a sentence based on clearly erroneous facts.'" Id. (quoting Gall, 552 U.S. at 51). "We review substantive reasonableness under the 'deferential abuse-of-discretion standard.'" Id. (quoting Gall, 552 U.S. at 52).

In calculating Johnson's sentence, the district court attributed more than fifteen kilograms of methamphetamine to him, which led to a base offense level of 38. See U.S.S.G. § 2D1.1(c)(1). "The government bears the burden of proving drug quantity by a preponderance of the evidence." United States v. Marshall, 411 F.3d 891, 894 (8th Cir. 2005). Drug quantity findings are findings of fact that are reviewed for clear error, and "we must affirm unless the entire record firmly convinces us that a mistake has been made." United States v. Houston, 338 F.3d 876, 878 (8th Cir. 2003).

During the trial, Myrna Contreras testified that she oversaw drug shipments to Johnson "once or twice a month" from the end of 2004 until she was arrested, which was in May 2008. (Trial Tr. Vol. II at 78.) She explained that she would typically take between one and two pounds of methamphetamine to Johnson's house, and that at least once she took five pounds. According to her testimony, she would usually deliver the methamphetamine to Johnson's home, and from there they would distribute it among the conspirators. Assuming that she oversaw a delivery to Johnson once a month from 2005 through April 2008, there were an estimated forty deliveries. Assuming further that one of those deliveries amounted to five pounds and the rest amounted to one pound each, that would equal forty-four pounds, or approximately twenty kilograms, of methamphetamine. Additionally, Shawn Montgomery and Victor Thomason both testified that they also made individual deliveries to Johnson totaling five pounds, or 2.3 kilograms.

After reviewing the record, we are not left with the firm conviction that a mistake has been made, and the district court did not clearly err in calculating that Johnson was liable for more than fifteen kilograms of methamphetamine. See Houston, 338 F.3d at 878.

After calculating a base offense level of 38, the district court added two offense levels for his role as an organizer, leader, manager, or supervisor in the criminal activity. See U.S.S.G. § 3B1.1(c). The district court held that "while [Johnson] [did not] rise to the level of a supervisor, . . . he clearly supervise[d] and manage[d] part of the conspiracy on behalf of [Myrna] Contreras." (Sentencing Tr. at 24.)

"We review the district court's decision to assess a sentencing enhancement based upon a defendant's role in the offense for clear error." United States v. Parish, 565 F.3d 528, 532 (8th Cir. 2009) (quotation marks omitted). "'For a two-level managerial role enhancement to apply, it is only necessary that the defendant supervise or manage one other participant.'" Id. (quoting United States v. Jimenez-

-14-

Gutierrez, 425 F.3d 1123, 1124 (8th Cir. 2005)). The term "manager" is construed broadly. Id.

At trial, the Government offered the testimony of Ken Grady, who stated that he approached Johnson as a means to get involved in the drug trade. Johnson "fronted" Grady the methamphetamine and collected the money from Grady after the methamphetamine was sold. (Trial Tr. Vol. I at 32.) Johnson was a "key link" between the drug suppliers and Grady. Cf. United States v. Knight, 96 F.3d 307, 310 (8th Cir. 1996) (explaining that the fact that defendant was a "key link" between drug suppliers and distributors and customers supported the finding that defendant was an organizer or leader of criminal activity), cert. denied, 520 U.S. 1180 (1997). We cannot say that the district court committed any error in finding that Johnson was a manager in the conspiracy.

Therefore, the district court did not commit procedural error either in calculating the drug quantity or in imposing a two-level enhancement for Johnson's role in the offense.

Johnson next contends that the district court's sentence was substantively unreasonable because it failed to consider both his age and his history of substance abuse in imposing the 360-month sentence. Johnson was 50 when he was sentenced, and Johnson argues that this should have been taken into consideration because there is a decreased likelihood of recidivism for defendants over 40. However, U.S.S.G. § 5H1.1 states that "[a]ge . . . is not ordinarily relevant in determining whether a departure is warranted," although it does explain that "[a]ge may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment . . . might be equally efficient as and less costly than incarceration." Here, Johnson is not elderly, and there is no indication that he is infirm. While a district court is not bound by departure precedents when making variance decisions, it may still consider the departure precedents as persuasive authority. See United States v.

Chase, 560 F.3d 828, 832 (8th Cir. 2009); see also United States v. McFarlin, 535 F.3d 808, 811 (8th Cir. 2008) (considering the departure guidelines in assessing the reasonableness of the variance). The Sentencing Guidelines also explain, when discussing drug abuse, that "drug or alcohol dependence or abuse is not a reason for a downward departure." U.S.S.G. § 5H1.4 (noting that "[s]ubstance abuse is highly correlated to an increased propensity to commit crime").[4]

Moreover, Johnson raised these issues in his sentencing memorandum to the district court. At the sentencing hearing, when the district court asked if there was anything Johnson wanted it to consider before imposing the sentence, Johnson's counsel indicated Johnson's sentencing memorandum. Thus, the district court was aware of Johnson's arguments, and we therefore presume that the district court considered and rejected them. See United States v. Miles, 499 F.3d 906, 909 (8th Cir. 2007) (explaining that a district court's awareness of the defendant's arguments precludes any conclusion that the district court abused its discretion by failing to consider them). Thus, we reject Johnson's argument that the district court abused its discretion in sentencing by failing to consider Johnson's age and history of substance abuse.

---

[4]We note that the United States Sentencing Commission has proposed amending the sentencing guidelines effective November 1, 2010, such that, subject to any Congressional action prior to that date, § 5H1.1 will read "[a]ge . . . may be relevant in determining whether a departure is warranted, if considerations based on age, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." The relevant portion of § 5H1.4 likewise is proposed to read, "drug or alcohol dependence or abuse ordinarily is not a reason for a downward departure." However, we note that defendants are sentenced under the guidelines in effect on the date of sentencing, and thus, these proposed amendments have no effect on our analysis.

-16-

## III.

Accordingly, the judgment of the district court is affirmed.

_____