# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 10-1167

———————

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Nebraska. |
| Kevin S. Boslau, | * | |
| | * | |
| Appellant. | * | |

———————

Submitted: November 18, 2010
Filed: February 15, 2011

———————

Before RILEY, Chief Judge, MELLOY and GRUENDER, Circuit Judges.

———————

MELLOY, Circuit Judge.

A jury returned a guilty verdict against Kevin Boslau ("Boslau") for knowingly transferring four firearms to a prohibited person, in violation of 18 U.S.C. § 922(d), and for making false statements in connection with the acquisition of a firearm, in violation of 18 U.S.C. § 922(a)(6). The district court[1] sentenced him to fifty-seven months of incarceration, followed by three years of supervised release. Boslau appeals the district court's denial of his motion to suppress, one of the jury

---

[1]The Honorable Richard G. Kopf, United States District Judge for the District of Nebraska.

instructions, the sufficiency of the evidence, and a specific sentencing enhancement relating to the use of a firearm in connection with another felony offense. We affirm.

I.

On November 25, 2008, Boslau and his girlfriend, Karen Arens ("Arens"), drove to the Grand Island Law Enforcement Center to speak with Investigators Mark Dreher ("Dreher") and Ben Aarants ("Aarants") of the Grand Island Police Department. Dreher wanted to speak with Boslau about a 9mm Glock pistol that Boslau purchased, which the government recently found in the possession of a convicted drug dealer, Danny Soumpholphakdy ("Soumpholphakdy"). Aarants wanted to speak with Boslau about a .40 caliber Taurus pistol that Boslau had purchased and reported stolen and that the government had recovered from Tommy Bouatic ("Bouatic") at the scene of a car accident. Boslau and Aarants arranged the meeting when Boslau telephoned Aarants in response to Aarants leaving a business card at Boslau's residence. According to Boslau, he did not know why the police wanted to speak with him, but he did immediately drive to the police station after the telephone call.

Upon arrival, Boslau and Arens were escorted to a small, windowless interview room, containing only a round table surrounded by four chairs. Boslau and Arens were seated away from the door and across from Aarants and Dreher. The door to the room was closed throughout the following forty-three minute interview. As the interview began, Aarants asked Boslau for some identification, and Boslau produced his driver's license. Aarants took the drivers license to fill out some paperwork, but failed to return it. Aarants then commenced questioning Boslau. Aarants asked Boslau about the reported theft, about how Bouatic knew of Boslau, and about the locations of Boslau's remaining weapons.

Approximately fourteen minutes into the interview, Dreher took over the questioning. Dreher showed Boslau an ATF form that Boslau had filled out when

purchasing the 9mm Glock pistol. Dreher specifically showed Boslau the portion of the form where Boslau attested to being the actual purchaser of the firearm and to not being an unlawful user of controlled substances. Dreher also informed Boslau that the 9mm pistol had been recovered from Soumpholphakdy, a convicted felon who was unable to lawfully possess a firearm. In response, Boslau stated that he knew Soumpholphakdy and that he knew Soumpholphakdy had sold drugs "at one time." Boslau, however, denied any knowledge of Soumpholphakdy's criminal record.

Dreher next informed Boslau of an interview Dreher had conducted with Robert Hainsworth ("Hainsworth"). Dreher indicated that Hainsworth was facing a significant period of prison time for weapons and narcotics charges and was looking to reduce his sentence by cooperating. Dreher also told Boslau that everyone gets this opportunity and that Dreher would soon be speaking to Soumpholphakdy. Dreher then informed Boslau that Hainsworth claimed Boslau and Arens had introduced him to a drug dealer in 2006 or 2007 and that Hainsworth had given Boslau and Arens a small amount of methamphetamine every time Hainsworth bought methamphetamine from the dealer. Boslau and Arens denied this, prompting Dreher to state that he was "going to show you what a conspiracy is." Dreher indicated that he could bring an indictment against Boslau given his involvement.

Dreher then informed Boslau of conversations Dreher had with Bob Cranston ("Cranston") and Bouatic. Dreher stated that Cranston claimed to know Soumpholphakdy and to know that Soumpholphakdy was delivering drugs to Boslau and Arens. Dreher further stated that Cranston claimed to know that Boslau had purchased a .40 caliber pistol and a 9mm pistol and that Boslau traded them to Soumpholphakdy for narcotics. Additionally, Dreher stated that Cranston indicated that Soumpholphakdy traded the .40 caliber pistol to satisfy a drug debt. Dreher finally stated that Bouatic said he obtained the .40 caliber pistol from Soumpholphakdy. At this point, Dreher asked Boslau what Soumpholphakdy would say about the guns. Boslau replied by stating that he did not trade or sell any of his firearms and that he did not even know the 9mm pistol was gone.

In response, Dreher (at approximately the twentieth minute of the interview) confronted Boslau, stating in part:

> Okay, and that's what you can stay at, and what I do is— I'm going to bring a federal indictment against you, Mr. Boslau, with the U.S. government over a firearms charge and probably a conspiracy to distribute methamphetamine. You can sit here and lie to me or you can help me figure out some of these gun charges.

Shortly thereafter, Aarants stated:

> This is the point where we're no longer talking to you as a victim of things. Okay? You need to know, you don't have to tell us anything. That's your right. You can walk out the door right now. You're free to leave, and I want you to know that.

Both Aarants and Dreher then told Boslau that he would not be arrested, with Dreher adding: "No, because you know what, I'm going to give the sweeter deal to the first person who gets on board. If you want to be in denial, walk out the door, but we will see you again." Aarants followed up by commenting: "This is your opportunity to let us know what's going on. This is your opportunity to work with us, so that we can work with you. We're not looking at you as the big guy, but we're looking at you as part of the picture." At this point, Aarants and Dreher proceeded to discuss how much time Hainsworth, Cranston, and Soumpholphakdy could spend in prison before Aarants asked Boslau: "Do you see where we're heading here? You need to think about what side of the fence you're going to be playing on."

Boslau responded by admitting that he was a drug user but denying that he ever sold narcotics. After further questioning and discussion, Boslau also stated that he permitted Soumpholphakdy to use the 9mm and the .40 caliber pistols and that Soumpholphakdy told him to report the .40 caliber pistol stolen. Boslau additionally

-4-

acknowledged that he had given Soumpholphakdy a rifle and two other pistols and that Soumpholphakdy had given him the money to purchase all of the firearms. Boslau finally admitted that he bought narcotics from Soumpholphakdy and Hainsworth. During this additional questioning and discussion, at approximately the thirty-second minute of the interview, Boslau asked if he was going to be arrested, and Aarants again stated no. Similarly, noticing that Aarants had not returned Boslau's driver's license, Dreher instructed Aarants to do so and told Boslau: "Well, we told you, you aren't under arrest, you can leave anytime, and when we're done you're gonna leave anytime." Aarants returned the drivers license, and the interview eventually concluded.

On December 17, 2008, a grand jury returned an indictment against Boslau, charging him with two crimes.[2] More specifically, Count One of the Indictment charged Boslau with knowingly transferring five firearms to Soumpholphakdy, a prohibited person, in violation of 18 U.S.C. § 922(d). Count Two charged Boslau with falsely stating that he was the actual purchaser of the firearms and that he was not an unlawful user of a controlled substance, in violation of 18 U.S.C. § 922(a)(6). Thereafter, Boslau moved to suppress the statements he made during the November 25, 2008 interview, claiming that the government violated his Miranda rights and that his statements were made involuntarily. Rejecting his arguments, the district court denied the motion on April 22, 2009.

Boslau subsequently elected to stand trial on both charges. During trial, the district court permitted the government to present statements Boslau made during the November 25, 2008 interview to the jury in its case-in-chief. The district court also denied Boslau's motions for a judgment of acquittal and rejected Boslau's proposed jury instruction on the meaning of an "unlawful user of a controlled substance." The

---

[2]A grand jury later returned a superseding indictment against Boslau, alleging the same two crimes but adding a forfeiture count and accusing Boslau of only transferring four weapons instead of the five initially charged.

jury later returned a guilty verdict on each count. Several months later, the district court sentenced Boslau to fifty-seven months of incarceration, followed by three years of supervised release, after finding a four-level enhancement under U.S. Sentencing Guideline § 2K2.1(b)(6) for transferring firearms to Soumpholphakdy knowing that Soumpholphakdy would either provide the weapons to his methamphetamine suppliers or use the weapons directly in his drug transactions. Boslau timely appeals.

## II.

Boslau challenges four rulings by the district court, namely: (1) the district court's denial of his motion to suppress; (2) the district court's instruction on the definition of an "unlawful user of a controlled substance"; (3) the district court's denial of his motions for a judgment of acquittal; and (4) the district court's finding that § 2K2.1(b)(6) applied. We address each argument in turn.

## A.

Boslau argues that the district court erred in denying his motion to suppress all statements and evidence derived from the November 25, 2008 interview because the government obtained his statements in violation of Miranda v. Arizona, 384 U.S. 436 (1966), and because he made the statements involuntarily, in violation of his due process rights. Boslau specifically argues that he was in custody during the time of the interview and that the government failed to properly advise him of his Miranda rights. To support his custody claim, Boslau states that a reasonable person in his situation would not have felt free to discontinue the interview and leave because: (1) Aarants summoned him to the police station and took his driver's license for a significant portion of the interview; (2) neither investigator informed him that he could leave until twenty minutes into the interview; (3) both investigators threatened him with prosecution and promised him leniency if he would cooperate by talking; and (4) his own lack of education and experience made him particularly vulnerable to the investigators' tactics. Alternatively, Boslau argues that his statements were

-6-

involuntary because the government overbore his will with the foregoing threats and promises. We disagree.

i.

"The Supreme Court in Miranda stated that warnings are required when interrogation is 'initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" United States v. New, 491 F.3d 369, 373 (8th Cir. 2007) (quoting Miranda, 384 U.S. at 444). Since then, the Supreme Court clarified that an individual is entitled to Miranda protections only when he is "in custody," with the inquiry ultimately turning on "whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (internal quotation marks omitted); see also United States v. Johnson, 619 F.3d 910, 919 (8th Cir. 2010) ("If an individual is not subjected to custodial interrogation, no warning need be given."). "Whether [Boslau] was in custody turns on whether, under the totality of the circumstances he faced at the time of his questioning, a reasonable person in his position would have felt free to end the interrogation and leave." United States v. Elzahabi, 557 F.3d 879, 883 (8th Cir. 2009).

In United States v. Griffin, we identified six factors to consider when evaluating whether an individual is in custody for purposes of Miranda:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the

-7-

questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

922 F.2d 1343, 1349 (8th Cir. 1990). "We observed that the first three factors tended to mitigate the existence of custody, while the last three tended to aggravate it." United States v. Czichray, 378 F.3d 822, 827 (8th Cir. 2004) (citing Griffin, 922 F.2d at 1349). Additionally, we have noted that these factors are not exclusive and that all of the factors need not weigh in favor of a defendant to establish custody. United States v. Ollie, 442 F.3d 1135, 1137–38 (8th Cir. 2006). We review the district court's factual determinations for clear error and "its conclusions of law, including the ultimate question of custody, de novo." Elzahabi, 557 F.3d at 883.

In this case, we do not find that Boslau was in custody at any point during the November 25, 2008 interview principally because, when the questioning shifted from inquisitorial to accusatorial, the investigators repeatedly told Boslau he was free to leave. See Griffin, 922 F.2d at 1349 ("The most obvious and effective means of demonstrating that a suspect has not been taken into custody or otherwise deprived of freedom of action is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will." (internal quotation marks and alterations omitted)). Prior to Dreher confronting Boslau approximately twenty minutes into the interview, both investigators were asking mostly informational questions in a non-threatening manner. Additionally, Aarants only requested and did not order Boslau to come to the station for questioning and permitted Arens to remain in the room with Boslau throughout the interview. See id. at 1352 (noting that "[a] frequently recurring example of police domination concerns the removal of the suspect from the presence of family, friends, or colleagues who might lend moral support during the questioning and deter a suspect from making inculpatory statements"). Even given the setting of a small, windowless interview room in a police station, the failure to timely return the driver's licence, the initial failure to inform Boslau that he did not have to comply with Aarants' interview request and could leave at anytime, and Boslau's limited education and experience, we

conclude that a reasonable person in Boslau's position would believe he was free to end the interview and ask Aarants to return the driver's license. Moreover, even after Boslau confronted Dreher and both investigators began making statement about prosecuting Boslau and the possibility of cooperation-based leniency, the investigators' steadfast and unequivocal statements that they were not going to arrest Boslau and that Boslau could leave at any time reveal that a reasonable person would still believe he was free to end the interview and leave. Indeed, Arens was still present to offer support, and the investigators never suggested that Boslau would be punished for the specific act of ending the interview beyond the commonplace tactic of stating that cooperation now may lead to a lesser sentence in the future. Accordingly, we hold that Boslau was not "in custody" during the interview.

ii.

"A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004) (internal quotation marks omitted). We discern whether a confession is voluntary under the totality of the circumstances, examining both the "conduct of the officers and the characteristics of the accused." Id. (internal quotation marks omitted). "We consider, among other things, the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." Sheets v. Butera, 389 F.3d 772, 779 (8th Cir. 2004). The mere fact that an officer may have elicited a confession "through a variety of tactics, including claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices," does not render a confession involuntary unless "the overall impact of the interrogation caused the defendant's will to be overborne." United States v. Brave Heart, 397 F.3d 1035, 1041 (8th Cir. 2005) (internal quotation marks omitted). "The government bears the burden of persuasion and must prove by a

preponderance of the evidence that the challenged statements were voluntary." LeBrun, 363 F.3d at 724. "We review the district court's ultimate determination of voluntariness de novo, but we review the factual findings underlying that determination for clear error." United States v. Astello, 241 F.3d, 965, 966 (8th Cir. 2001).

We can find little in the record to suggest that Boslau's will was overborne during any portion of the November 25, 2008 interview. The interview was comparatively brief, lasting only forty-three minutes, and Boslau was not in custody. Additionally, Boslau was an adult of average intelligence, and he already had some experience with the criminal-justice system, as his criminal record dates back to 1979. Moreover, Boslau had a companion with him throughout the entire interview lending support. Furthermore, the investigators were not physically aggressive towards Boslau, and they did not create any more psychological pressure than is commonly associated with interrogations. At most, the investigators stated that they may prosecute Boslau and that they may be willing to show him leniency if he cooperated, but after closely reviewing the video recording of the interview, we do not believe these statements overbore Boslau's will. Consequently, the government has carried its burden of proof, and we find that Boslau's statements during the interview were made voluntarily. Accordingly, we affirm the district court's denial of Boslau's motion to suppress.

B.

Boslau next argues that the district court erroneously instructed the jury of the meaning of an "unlawful user of a controlled substance." The district court instructed the jury that, in order to convict Boslau of making a false statement in connection with the acquisition of a firearm, the jury must find that "the defendant falsely represented that he was not an unlawful user of a controlled substance or falsely represented that he was the actual purchaser of a firearm." The district court defined the term "unlawful user of a controlled substance" to mean:

-10-

a person who is a current user of a controlled substance in a manner other than as prescribed by a licensed physician. Such use is not limited to the use of drugs on a particular day, or within a matter of days or weeks before, but rather that the unlawful use has occurred recently enough to indicate that the individual is actively engaged in such conduct. A person may be an unlawful current user of a controlled substance even though the substance is not being used at the precise time the person seeks to acquire a firearm. An inference of current use may be drawn from evidence of a recent use or possession of a controlled substance or a pattern of use or possession that reasonably covers the present time.

Boslau asserts that the district court's definition was overly inclusive because the definition did not require the jury to find that the illicit drug use was "consistent, regular, and continuous, over an extended period of time." Boslau maintains that the district court should have adopted the approach of other circuits, including the Fifth Circuit in United States v. Herrera ("Herrera I"), and instructed the jury that the government was required to show Boslau's drug use "fell just short" of a "full fledged addiction." 289 F.3d 311, 323–24 (5th Cir. 2002) ("Giving the term a narrow construction, we hold that an 'unlawful user' is one who uses narcotics so frequently and in such quantities as to lose the power of self control and thereby pose a danger to the public morals, health, safety, or welfare. In other words, an 'unlawful user' is someone whose use of narcotics falls just short of addiction, as that term is defined by the Controlled Substances Act."), vacated, United States v. Herrera ("Herrera II"), 313 F.3d 882, 885 (5th Cir. 2002). Boslau also attempts to distinguish the district court's instruction from the instruction we upheld in United States v. Turnbull, claiming that the district court omitted a material portion of the Turnbull instruction relating to the a defendant losing the "power of self-control with reference to the use of [a] controlled substance." 349 F.3d 558, 561 (8th Cir. 2003), vacated on other grounds by 543 U.S. 1099 (2005) (finding a Booker error), reinstated by 414 F.3d 942 (8th Cir. 2005). We disagree.

-11-

"We review a district court's jury instructions for abuse of discretion." United States v. Haas, 623 F.3d 1214, 1219 (8th Cir. 2010). In Turnbull, we held that a district court acted within its discretion when adopting the Treasury Department's definition of an "unlawful user of a controlled substance" and instructing the jury that the term means:

> *A person who uses a controlled substance and has lost the power of self-control with reference to the use of controlled substance*; and any person who is a current user of a controlled substance in a manner other than as prescribed by a licensed physician. Such use is not limited to the use of drugs on a particular day, or within a matter of days or weeks before, but rather that the unlawful use has occurred recently enough to indicate that the individual is actively engaged in such conduct. . . .

349 F.3d at 561 (emphasis added). We did so even though we are not bound to the Treasury Department's definition because Congress did not otherwise define the term in the governing statute and because the instruction adequately captured the "temporal nexus [between the proscribed act] and regular drug use" required by the term. Id.; see also United States v. Patterson, 431 F.3d 832, 838–39 (5th Cir. 2005) (concluding that "cases interpreting [the meaning of an unlawful user of a controlled substance] typically discuss two concepts: contemporaneousness and regularity"). We also declined to hold that a district court abuses its discretion when failing to adopt the definition of "an unlawful user of a controlled substance" provided for in Herrera I, both because of our prior decisions and because the Fifth Circuit vacated the pertinent provision of Herrera I in Herrera II. Turnbull, 349 F.3d at 562; see also Patterson, 431 F.3d at 838 (stating that "no circuit has construed the statute in the manner proposed by the district court and Herrera I").

Here, when viewed in its totality, the district court's instruction required the government to prove that Boslau was "actively engaging" in the unlawful use of a controlled substance during the time period in which he purchased the 9mm Glock pistol and claimed not to be an unlawful user of controlled substances. Even without the first clause of the Treasury Department's definition, we believe that the district court's instruction was sufficient because "actively engaging" sufficiently encompasses the requisite temporal nexus between the purchase of a firearm and regular drug use that the statute requires. See Turnbull, 349 F.3d at 561; see also United States v. Burchard, 580 F.3d 341, 346, 351–52 (6th Cir. 2009) (affirming the use of an instruction nearly identical to that of the district court's before crafting a substantively similar instruction to be given in future cases). We find Boslau's arguments to the contrary unpersuasive in part because this Court has already rejected the more rigorous definition embodied in Herrera I. Turnbull, 349 F.3d at 562. Accordingly, the district court did not abuse its discretion when instructing the jury on the meaning of "an unlawful user of a controlled substance."

C.

Boslau also challenges the district court's denial of his motions for judgment of acquittal. Boslau argues that the government failed to present sufficient evidence for a reasonable jury to convict him on either charge because the government's key witness, Soumpholphakdy, "was so incredible and unreliable that no reasonable jury could have believed him." Boslau asserts that Soumpholphakdy's trial testimony was unreliable because some of it was inconsistent with statements he made during a plea hearing and because Soumpholphakdy was a convicted felon, who had a strong incentive to fabricate incriminating testimony due to his cooperation agreement with the government. Boslau also claims that the government failed to present sufficient evidence on Count Two, making false statements in connection with the purchase of a firearm, because the ATF form he filled out when purchasing the 9mm Glock pistol did not define the term "unlawful user of a controlled substance" and because the

government failed to present any evidence that he knew what the term meant.  We disagree.

"When judgment of acquittal is sought on the basis of insufficiency of the evidence we view the evidence in the light most favorable to the verdict and give the government the benefit of all reasonable inferences that can logically be drawn from the evidence."  United States v. Street, 531 F.3d 703, 710 (8th Cir. 2008).  "The standard of review is very strict, and we will reverse the conviction only if we conclude that no reasonable jury could have found the accused guilty beyond a reasonable doubt."  United States v. Beck, 496 F.3d 876, 879 (8th Cir. 2007) (citations omitted) (internal quotation marks omitted).  We review the denial of a motion for judgment of acquittal de novo.  United States v. Van Nguyen, 602 F.3d 886, 897 (8th Cir. 2010).

In this case, Soumpholphakdy testified that Boslau purchased several weapons for him, including the 9mm Glock pistol for which Boslau filled out the ATF form.  Soumpholphakdy also testified that he apprised Boslau of his felony status and his inability to legally purchase firearms when he first asked Boslau to purchase a firearm for him.  Additionally, Soumpholphakdy testified that Boslau routinely used methamphetamine.  The government corroborated the core aspects of his testimony, mostly through admitting portions of Aarants and Dreher's November 25, 2008 interview with Boslau, in which Boslau essentially confessed to purchasing several firearms for Soumpholphakdy and being a drug user.  Viewing this evidence in the light most favorable to the government, we conclude that a reasonable jury could have found Soumpholphakdy's testimony credible and convicted Boslau on both counts.  Even Boslau's more specific argument—that the government failed to prove he knew the meaning of the term "unlawful user of a controlled substance"—is unpersuasive because a reasonable jury could conclude that Boslau knew the term encompassed his ongoing use of methamphetamine.  Accordingly, we affirm the district court's denial of Boslau's motions for a judgment of acquittal.

D.

Boslau finally challenges the district court's application of § 2K2.1(b)(6), which states in relevant part:

> If the defendant used or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense, increase by 4 levels.

The district court applied this enhancement because it found that Boslau transferred firearms to Soumpholphakdy knowing that Soumpholphakdy was using them to facilitate his drug dealing and that Soumpholphakdy was providing the weapons to his methamphetamine suppliers. Boslau challenges this finding, arguing that the enhancements are based upon Soumpholphakdy's unreliable testimony. We review the district court's findings of fact for clear error, and we find no clear error because the government sufficiently corroborated Soumpholphakdy's testimony with Boslau's own statements. See United States v. Smith, 535 F.3d 883, 885 (8th Cir. 2008) ("The district court's determination that the defendant possessed the firearms in connection with another felony is a factual finding that we review for clear error."). Accordingly, we affirm the district court's application of § 2K2.1(b)(6).

III.

For the foregoing reasons, we affirm the district court in all respects.

_____

-15-