# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-2437

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | *   Appeal from the United States |
| v. | *   District Court for the |
| | *   District of Nebraska. |
| Larry Vega, | * |
| | * |
| Appellant. | * |

_____

Submitted: January 13, 2012
Filed: April 17, 2012

_____

Before BYE, SMITH, and COLLOTON, Circuit Judges.

_____

SMITH, Circuit Judge.

A jury convicted Larry Vega of possession with intent to distribute five grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1). The district court[1] denied Vega's motion for judgment of acquittal or, in the alternative, new trial, and entered judgment against Vega, sentencing him to 80 months' imprisonment. On appeal, Vega argues that the district court erroneously (1) denied Vega's motion to suppress evidence obtained from a search of his residence and statements made at the time of his arrest; (2) permitted evidence of acquitted conduct

_____

[1]The Honorable Lyle E. Strom, United States District Judge for the District of Nebraska.

at his retrial; (3) denied his motion for judgment of acquittal or, in the alternative, new trial; (4) applied the obstruction-of-justice enhancement under U.S.S.G. § 3C1.1; and (5) denied Vega acceptance of responsibility under U.S.S.G. § 3E1.1. We affirm.

## I. *Background*

Larry Vega was charged with conspiracy to distribute and possess with intent to distribute five grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1), and 846 ("Count 1"); distribution of less than five grams of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1) ("Count 2"); possession with intent to distribute five grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1) ("Count 4")[2]; and possession of a firearm while being an unlawful user of and addicted to a controlled substance, in violation of 18 U.S.C. § 922(g)(3) ("Count 5"). Vega pleaded not guilty to all counts of the indictment.

### A. *Motion to Suppress*

Vega moved to suppress evidence found after execution of a search warrant on his residence, as well as statements that he made at the time of his arrest. Vega argued that the affidavit for the search warrant did not establish probable cause and that his statements were involuntary because the police officers did not read him his *Miranda* rights and threatened to have his children taken away. At the suppression hearing, the magistrate judge admitted into evidence the affidavit and application for issuance of a search warrant and the search warrant for Vega's residence. Omaha Police Officer Robert Branch, Jr. testified that after execution of the search warrant, he entered the residence and interviewed Vega to determine the owner of the narcotics and gun discovered during the search. According to Officer Branch, he advised Vega of his *Miranda* rights by "read[ing] them from a laminated card that [Officer Branch]

_____

[2]Count 3 charged Vega's codefendant, Daniel Horvath, with possession of firearms while being an unlawful user of and addicted to a controlled substance, in violation of 18 U.S.C. § 922(g)(3).

carri[ed] on [him]." Vega replied that he understood his rights and agreed to make a statement. But "Vega was not cooperating and basically did not provide any additional information." Thereafter, Omaha Police Officer Mark Noonan confronted Vega with methamphetamine and a gun found in Vega's garage. Officer Noonan testified that Vega "said the drugs and handguns were not his; however, he was going to take responsibility for them." Both Officers Branch and Noonan denied making any threats to Vega during questioning.

Vega, on the other hand, testified that Officer Branch never read him his *Miranda* rights. Vega explained that the reason that he told Officer Noonan that he would "take responsibility" for the methamphetamine and gun was because the officers threatened to have his children taken away and to charge his girlfriend with a crime.

The magistrate judge recommended that the district court deny Vega's motion to suppress. The magistrate judge found Officers "Branch and Noonan to be credible" and found "Vega to be less than credible" and "his comments self-serving." Ultimately, the magistrate judge found that Vega's statements were admissible because Officer Branch read Vega his *Miranda* rights prior to the custodial interrogation and "Officer Noonan correctly relied upon the previous *Mirandizing* of Vega by Branch." (Emphasis added.) The magistrate judge determined that the officers never threatened Vega and "that he freely, voluntarily, knowingly, intelligently waived his rights and chose to g[i]ve a statement."

After finding Officers Branch and Noonan credible, the magistrate judge concluded that the search warrant for Vega's residence "was based upon probable cause" because the affidavit provided that Dan Horvath, Vega's codefendant, told the cooperating witness that "he had to go get the methamphetamine," left the residence, walked across the street to Vega's residence, and returned to the cooperating witness a few moments later with a small ziplock bag containing methamphetamine.

Alternatively, the magistrate judge found that even if probable cause did not exist within the four corners of the warrant, "the officers in this case made a good-faith reliance upon the issuing warrant by the magistrate."

The district court adopted the magistrate judge's report and recommendation and denied Vega's motion to suppress.

## B. *Trials*

Thereafter, the grand jury returned a superseding indictment, which additionally charged Vega with using a firearm in furtherance of the crime set forth in Count 4, in violation of 18 U.S.C. § 924(c)(1)(A) ("Count 6").

Vega proceeded to trial on the five counts against him. The jury found Vega not guilty on Counts 1, 2, and 6, and the district court declared a mistrial as to Counts 4 and 5.

Prior to his second trial on Counts 4 and 5, Vega moved for an order in limine to prevent the government from introducing evidence of the acquitted conduct. Vega asserted that if the district court permitted such evidence, then the court should also permit him "to present evidence of the prior acquittals for the conduct." The district court denied the motion.

During Vega's second trial, the following facts were established. In January 2010, a cooperating witness contacted Officer Branch and informed him that the cooperating witness "could make a controlled buy from an individual that he knew as Dan." The cooperating witness identified 1311 Kavan Street, Omaha, Nebraska, as "Dan's" residence. Officers verified that the occupant of the residence was Daniel Horvath and conducted a records search to determine if Horvath had a criminal history or police contacts.

On January 12, 2010, Officer Branch had the cooperating witness make a controlled buy from Horvath at his residence. The cooperating witness contacted Horvath and requested $300 worth of methamphetamine. Horvath then called Vega and asked if he had 3.5 grams—an "eight-ball"—of methamphetamine. This amount of methamphetamine was sufficient to cover the amount that the cooperating witness requested. Vega confirmed to Horvath that he had the requested amount of methamphetamine.

Law enforcement provided the cooperating witness "with $300 of Omaha Police Department buy fund money and instructed [him] to attempt to purchase an eight-ball, 3.5 grams, of methamphetamine." Officers monitored the cooperating witness's actions "[v]ia the electronic monitoring device that he [was] equipped with," which "record[ed] audio [and] video."

Prior to the cooperating witness's arrival at 1311 Kavan Street, Officer Jeff Hunter of the Omaha Police Department went to the area in an unmarked vehicle to establish surveillance. He parked in front of 4022 South 13th Street, Omaha, Nebraska, where he was also able to observe 1311 Kavan Street.

The cooperating witness entered the residence located at 1311 Kavan Street and remained inside the residence for approximately "five to ten minutes." "Horvath explained to [the cooperating witness] that he'd be right back," although Horvath "didn't indicate where he was going." Officer Hunter "observed [Horvath] walk directly across the street to 4022 South 13th Street where he was observed to meet with a Hispanic male in the driveway of the residence." The "Hispanic male" that Horvath met with was Vega. Officer Hunter observed Horvath and Vega have "[a] brief conversation in the driveway that lasted just a few seconds." Then, Horvath and Vega "proceeded into 4022 South 13th Street."According to Horvath, once inside Vega's residence, Horvath gave Vega "the $300 that [Horvath had] received from the informant," and Vega gave Horvath "$300 worth of meth[amphetamine]" in "[a] little

zip-lock baggie" that had "the ace of spades on it." "A few moments later," Officer Hunter observed Horvath exit Vega's residence and return to Horvath's residence.

After returning to his home, Horvath confirmed on his own scale that the quantity of the methamphetamine was 3.5 grams. He then removed 0.5 grams from the allotment for his personal use. After receiving the methamphetamine, the cooperating witness returned to the officers with approximately 3 grams of methamphetamine in "a transparent clear small zip-lock bag" that had "an ace of spades design[]"on it. Officer Branch conducted a field test on the methamphetamine. To confirm the field test, the methamphetamine was sent to the Eastern Nebraska Forensic laboratory for analysis. The parties stipulated to the test results, which showed that the substance tested as 2.7 grams of methamphetamine, with a purity level of approximately 80 percent.

"Within 72 hours of that date, a search warrant was drafted for the residence of 1311 Kavan Street and 4022 South 13th Street." Law enforcement "suspected that both residences were involved in the distribution of methamphetamine working hand in hand together." Then, on January 22, 2010, law enforcement executed dual search warrants on Horvath's residence at 1311 Kavan Street and Vega's residence at 4022 South 13th Street.

Upon entering Horvath's residence, Officer Branch located Horvath, placed him under arrest, and advised him of his *Miranda* rights, which Horvath waived. After a search of the residence yielded "three firearms, [a] digital scale, [a] methamphetamine pipe, [a] marijuana pipe, marijuana, [and] a small amount of United States currency," Officer Branch confronted Horvath "with these evidentiary items." Horvath told Officer Branch that "he was a user of methamphetamine" who "had received methamphetamine from Larry, the individual across the street, in small quantities like [$]20 and $30 worth[,] which is basically .2, .3 grams of methamphetamine." When Officer Branch told Horvath that the "cooperating witness had purchased a larger

amount of methamphetamine from him than just .2 or .3 grams," Horvath "denied any knowledge of that."

Officer Branch proceeded to Vega's residence at 4022 South 13th Street. The search of Vega's residence resulted in the discovery of "[a] drug scale, . . . small zip-lock bags with the ace of spades designs, [a] marijuana pipe, marijuana, approximately nine grams of methamphetamine[,] and a .22-caliber handgun." Officer Branch "also found [a cellular] phone on the person of Larry Vega." Officer Branch discovered "Daniel Horvath's phone number in Mr. Vega's phone." Officers had discovered the methamphetamine and firearm in a detached garage on the premises. Officer Branch conducted a field test on the methamphetamine and subsequently had it sent to the Eastern Nebraska Forensic Laboratory, where it was determined that the drug had a lab weight of 8.6 grams and was 80 percent pure methamphetamine.

Officer Branch "escorted [Vega] to [the] northwest bedroom, advised him who [Officer Branch] was, explained to [Vega] that he was being investigated for a narcotics investigation, explained to him that a quantity of methamphetamine had been located in the residence along with a firearm[,] and . . . advised him of his *Miranda* rights." (Emphasis added.) Officer Branch testified that Vega expressly waived his *Miranda* rights and never requested an attorney. According to Officer Branch, Vega initially denied knowledge of the methamphetamine and firearm and involvement in the distribution of methamphetamine. Officer Branch ended the interview.

Thereafter, Officer Noonan interviewed Vega "[t]o determine who had the keys to the lock on the garage." Vega acknowledged that he had keys and access to the garage. According to Officer Branch, when Officer Noonan was questioning Vega, Vega also "stated that he'd . . . take responsibility for the methamphetamine and the . . . gun; however, [they] w[ere] not his." Officer Noonan testified that no threats were

made to Vega during his interview and that Officer Noonan never threatened Vega with calling child protective services.

Retired Omaha Police Officer Mark Lang, a 22-year veteran of the Omaha Police Department who had been involved in "hundreds, maybe thousands" of drug investigations, testified that 8.6 grams of methamphetamine would have sold for "[$]800 and $900" in January 2010. He also testified that, based on his past investigation, it was "common" for methamphetamine users to sell methamphetamine to support their habit. According to Officer Lang, he had never "encountered someone who bought 8.6 grams of ice methamphetamine for their personal use."

Horvath testified that he was getting his methamphetamine from Vega in January 2010 and had been getting methamphetamine from Vega for "about three months" prior to January 22, 2010. According to Horvath, he was getting "anywhere from $20 . . . to an eight-ball" from Vega. Horvath confirmed that an "eight-ball" is 3.5 grams. According to Horvath, he never purchased an eight-ball from Vega for personal use; instead, he would "get it for somebody else who would call [him] up and ask [him] for it." Horvath would "charge" those individuals by "tak[ing] some out for [his] own personal gain." Horvath stated that he supported his methamphetamine habit "[b]y selling to other people. Well, getting it for other people."

Similar to his testimony during the suppression hearing and first trial, Vega testified that Officer Branch never read him his *Miranda* rights and that officers had threatened to charge his girlfriend and have his children taken away. But Vega did testify that he lied to the officers on the night of the search when he stated that the methamphetamine and gun were not his. Vega also admitted that he began using methamphetamine "[p]robably five years ago," used methamphetamine "[e]very other day," and had a $300-to-$400-per-week methamphetamine habit. Vega denied "ever sell[ing] methamphetamine to support [his] habit."

-8-

The jury found Vega guilty as to Count 4 and not guilty as to Count 5. Vega moved for judgment of acquittal or, in the alternative, a new trial. The district court denied the motion.

## C. *Sentencing*

At sentencing, over Vega's objection, the district court determined that the obstruction-of-justice enhancement under U.S.S.G. § 3C1.1 applied, stating:

> It's very difficult when a defendant takes the witness stand and testifies, and he did testify in this case that he did not distribute, did not intend to—that it was all for his own personal use. Of course, that's contrary to what the jury found.
>
> And having done that it seems to me under the United States Sentencing Guidelines that the obstruction of justice is an appropriate adjustment to a determination of his offense level so I will deny your request in that regard.

The district court also found that Vega was not entitled to acceptance of responsibility under U.S.S.G. § 3E1.1.

Thereafter, the court calculated an adjusted offense level of 28 and a criminal history category of III, resulting in a Guidelines range of 97 to 121 months' imprisonment. The court then considered Vega's motion for a downward variance and concluded that, taking into consideration the § 3553(a) factors, "the [G]uideline[s] sentence is more severe than is appropriate for this case." The court sentenced Vega to 80 months' imprisonment, with credit for time served since March 25, 2011, and four years of supervised release.

## II. *Discussion*

On appeal, Vega argues that the district court erroneously (1) denied Vega's motion to suppress evidence obtained from a search of his residence and statements

made at the time of his arrest; (2) permitted evidence of acquitted conduct at his retrial; (3) denied his motion for judgment of acquittal or, in the alternative, new trial; (4) applied the obstruction-of-justice enhancement under U.S.S.G. § 3C1.1; and (5) denied Vega acceptance of responsibility under U.S.S.G. § 3E1.1.

## A. *Motion to Suppress*

Vega asserts that the district court erred in denying his motion to suppress. He challenges both the issuance of the search warrant upon his residence and the purportedly incriminating statements that he made to Officer Branch during the custodial interrogation.

## 1. *Search Warrant*

According to Vega, the district court erred in denying his motion to suppress because probable cause did not exist to support a search of his residence. Vega asserts that probable cause was lacking for issuance of a search warrant because (1) no informant stated that methamphetamine could be purchased at Vega's residence, (2) no controlled buy ever occurred in which methamphetamine was purchased from Vega, (3) no evidence showed that Horvath and Vega exchanged drugs or money, and (4) nothing recorded on the electronic monitoring device placed on the informant's person indicated that Vega was selling methamphetamine. As a result, Vega contends that insufficient evidence existed to establish probable cause because the officers only observed Horvath walk over to Vega's residence; they did not witness any actions or hear any communications that could relate to the distribution of methamphetamine. According to Vega, Horvath's vague statement "I have to go get it I will be back" is insufficient to create probable cause because it merely reveals that Horvath did not have any methamphetamine on his person.

> "On appeal of the grant or denial of a motion to suppress, we review the district court's historical factual findings for clear error and its conclusions of law on the probable cause issue de novo." *United States v. Wells*, 223 F.3d 835, 838 (8th Cir. 2000). "Our role is to ensure that

the evidence as a whole provides a substantial basis for finding probable cause to support the issuance of the search warrant." *United States v. Terry*, 305 F.3d 818, 822 (8th Cir. 2002). "For probable cause to be shown, the warrant application and affidavit must describe circumstances showing that, based on practical experience and common sense, there is a fair probability that contraband or similar evidence will be found in the targeted place." *United States v. Nguyen*, 526 F.3d 1129, 1133 (8th Cir. 2008). "When reviewing the sufficiency of an affidavit to support probable cause, we consider the 'totality of the circumstances.'" *United States v. Searcy*, 181 F.3d 975, 981 (8th Cir. 1999) (quoting *United States v. Wright*, 145 F.3d 972, 975 (8th Cir. 1998)).

*United States v. Augustine*, 663 F.3d 367, 372 (8th Cir. 2011).

We conclude that "[t]he search warrant application in this case supports a finding of probable cause." *Id.* From the search warrant application, one can reasonably infer that Horvath obtained the methamphetamine that he sold to the cooperating witness from Vega. *Cf. United States v. Thompson*, 210 F.3d 855, 860 (8th Cir. 2000) ("Although it is well established that a judge may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant, we have also recognized that law enforcement officers may make reasonable inferences in preparing affidavits in support of a warrant." (internal citations omitted)). First, the application provides that "[t]he [cooperating witness] stated [that] Dan [Horvath] told him/her [that] he had to go get the methamphetamine and he then left the residence and a few moments later Dan [Horvath] returned." Second, the application states that, once Horvath departed his residence, "Officer Hunter observed a white male, suspected of being Dan Horvath, exit the residence and walk across the street to the residence located at 4022 South 13th Street." Officer Hunter then saw "the white male meet with a Hispanic male standing in the driveway" and observed both males "enter the residence of 4022 South 13th Street," which belonged to Vega. Third, the application provides that "two or three minutes later," Officer Hunter saw the white male "exit the residence located at

4022 South 13th Street and walk back to the south and into the residence at 1311 Kavan Street." The cooperating witness confirmed that, upon Horvath's reentry into the residence at 1311 Kavan Street, Horvath "handed him/her a small ziplock bag containing methamphetamine."

## 2. *Incriminating Statements*

Vega maintains that his statements to the officers were inadmissible because "they were elicited through threats of criminal liability and the state interfering with his children, all without an appropriate *Miranda* warning." According to Vega, "[t]his threat of the government taking his children is sufficient to show that this quasi-confession [that he would take responsibility for the gun and methamphetamine even though they were not his] was the result of unacceptable intimidation."

"A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *United States v. Boslau*, 632 F.3d 422, 428 (8th Cir. 2011) (quotation and citation omitted). To determine whether a confession is voluntary, we look at "the totality of the circumstances, examining both the conduct of the officers and the characteristics of the accused." *Id.* (quotation and citation omitted). This court "consider[s], among other things, the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." *Id.* (quotation and citation omitted). Whether a defendant "received *Miranda* warnings only moments before he made his incriminating statements . . . [is] a consideration [the Supreme Court has] treated as important, although not dispositive," in determining voluntariness. *Rawlings v. Kentucky*, 448 U.S. 98, 107 (1980).

"The government bears the burden of persuasion and must prove by a preponderance of the evidence that the challenged statements were voluntary." *Boslau*, 632 F.3d at 429 (quotation and citation omitted). Although we "review the district

court's ultimate determination of voluntariness de novo," we review for clear error "the factual findings underlying that determination." *Id.* (quotation and citation omitted).

Here, the district court found credible Officer Branch's and Officer Noonan's testimony that Officer Branch read Vega his *Miranda* rights and that neither officer used any threats against Vega in an attempt to elicit a confession. "[C]redibility determinations [by the district court] are virtually unreviewable on appeal." *United States v. Carothers*, 337 F.3d 1017, 1019 (8th Cir. 2003) (quotation and citation omitted). Based on Officer Branch's and Officer Noonan's testimony, Vega received his *Miranda* rights and spoke to the officers without threats or coercion. Therefore, applying the totality of the circumstances, we conclude that Vega's statement to the officers that he would take responsibility for the methamphetamine and gun found in his garage was voluntary.

Accordingly, we hold that the district court did not err in denying Vega's motion to suppress.

## B. *Acquitted Conduct*

Vega argues that the district court erred in permitting evidence of acquitted conduct at his retrial or, in the alternative, erred in not permitting him to introduce evidence of the prior jury's acquittals. Vega points out that, at his first trial, the jury acquitted him of Counts 1, 2, and 6. Counts 1 and 2 encompassed the events of January 12, 2010, while Count 6 charged Vega with using a firearm in the furtherance of a drug trafficking crime. Therefore, he contends that evidence from the January 12, 2010 drug transaction had little probative value given the first jury's verdict; thus, the prejudicial effect substantially outweighed the probative value of the evidence. In the alternative, Vega asserts that when the district court permitted testimony concerning the events of January 12, 2010, it should have permitted him to present evidence of the prior acquittals for the conduct that the government was alleging to be true.

-13-

According to Vega, "[t]he jury was permitted to utilize acquitted conduct in its deliberations despite a previous jury already determining that [he] was not a gun-utilizing drug dealer and that he did not distribute marijuana on January 12, 2010."

Federal Rule of Evidence 404(b)[1] provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

"The rule is one of inclusion, 'such that evidence offered for permissible purposes is presumed admissible absent a contrary determination.'" *United States v. Cowling*, 648 F.3d 690, 699 (8th Cir. 2011) (quoting *United States v. Johnson*, 439 F.3d 947, 952 (8th Cir. 2006)). "We review evidentiary rulings of the district court for abuse of discretion, and will reverse a district court's decision to admit evidence under 404(b) only if such evidence had no bearing on the case and was introduced solely to prove the defendant's propensity to commit criminal acts." *Id.* (quotations and citations omitted). Under Rule 404(b), "evidence of other crimes is admissible . . . if it is (1) relevant to a material issue; (2) similar in kind and close in time to the crime

---

[1]"A new version of the Federal Rules of Evidence went into effect on December 1, 2011 as part of the Federal Rules Style Project." *United States v. Jean-Guerrier*, 666 F.3d 1087, 1091 n.2 (8th Cir. 2012). "These changes are intended to be stylistic only." Fed. R. Evid. 404 advisory committee's note. "All quotations here are from the rules in effect during [Vega's] [March 2011] trial." *Jean-Guerrier*, 666 F.3d at 1091 n.2.

-14-

charged; (3) proven by a preponderance of the evidence; and (4) if the potential prejudice does not substantially outweigh its probative value." *Id.* (quotation and citation omitted).

Here, the evidence from the January 12, 2010 drug transaction was relevant to whether Vega intended to distribute methamphetamine on January 22, 2010—the date the search warrant was executed. At trial, Horvath testified that, on January 12, 2010, he purchased from Vega "$300 worth of meth[amphetamine]" in "[a] little zip-lock baggie" that had "the ace of spades on it." The events of January 12, 2010, are what led to the execution of the search warrant on January 22, 2010. Officer Branch testified that, on January 22, 2010, Horvath stated that he "had received methamphetamine from Larry, the individual across the street." A search of Vega's residence on January 22, 2010, uncovered not only a drug scale and 8.6 grams of methamphetamine but also packaging bearing the ace of spades design—the same type of packaging used during the controlled buy on January 12, 2010.

Moreover, the events of January 12, 2010, are similar in kind and close in time to the crime charged, and the government proved the events by a preponderance of the evidence. Vega has not contested these facts but instead argues that the prejudicial effect of the January 12, 2010 events substantially outweighed the probative value of the evidence. The district court, however, gave a limiting instruction on what weight, if any, the jury should give to the evidence of the January 12, 2010 drug transaction; the instruction stated:

> You have heard evidence that the defendant was involved in a drug transaction with Daniel Horvath on January 12, 2010. You may consider this evidence only if you find it is more likely true than not true. This is a lower standard than proof beyond a reasonable doubt. If you find that this evidence is more likely true than not true, you may consider it to help you decide motive, opportunity, intent, knowledge, preparation, plan, identity, and/or absence of mistake. You should give it the weight

and value you believe it is entitled to receive. If you find that it is not more likely true than not true, then you shall disregard it.

We conclude that "the risk of unfair prejudice was reduced by [this] cautionary instruction to the jury." *Cowling*, 648 F.3d at 699.

Vega's alternative argument that the district court should have allowed him to present evidence of his prior acquittals is foreclosed by applicable precedent. *See United States v. Wells*, 347 F.3d 280, 285–86 (8th Cir. 2003) (holding that district court's failure to instruct jury regarding prior acquittals was not abuse of discretion).

> The general rule is that although a judgment of acquittal is relevant with respect to the issues of double jeopardy and collateral estoppel, once it is determined that these pleas in bar have been rejected, a judgment of acquittal is not usually admissible to rebut inferences that may be drawn from the evidence that was admitted.

*Id*. at 286 (quotations and citations omitted). "[T]wo primary reasons" exist as to "why a judgment of acquittal is not generally admissible to rebut inferences that may be drawn from evidence that was the basis of a previous trial." *Id*. (quotation and citation omitted). The first reason is that "judgments of acquittal are hearsay." *Id*. (quotation and citation omitted). The second reason is that "judgments of acquittal are not generally relevant, because they do not prove innocence; they simply show that the government did not meet its burden of proving guilt beyond a reasonable doubt." *Id*. (quotation and citation omitted).

"The fact the government was unable to prove" the charges relating to the events of January 12, 2010, during the first trial "is not relevant to whether or not [Vega possessed with intent to distribute methamphetamine] on [January 22, 2010]." *Id*. ("The fact the government was unable to prove Wells possessed crack with the intent to distribute on April 13 or 18 is not relevant to whether or not Wells did so on

-16-

April 20."). Therefore, we hold that the district court did not err in declining to permit Vega to present evidence of his prior acquittals.

## C. *Motion for Judgment of Acquittal or New Trial*

Vega contends that the district court erroneously denied his motion for judgment of acquittal or, in the alternative, new trial.

### 1. *Judgment of Acquittal*

According to Vega, the district court erred in denying his motion for judgment of acquittal challenging the sufficiency of the evidence. He asserts that insufficient evidence supports his conviction because (1) the jury impermissibly based its conclusion that Vega was selling methamphetamine on the evidence of the January 12, 2010 drug transaction because the first jury acquitted Vega of distributing methamphetamine on that date, and (2) the mere quantity of the methamphetamine found at Vega's residence on January 22, 2010, does not support a finding that Vega was distributing methamphetamine.

Federal Rule of Criminal Procedure 29(a) provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." "In reviewing the sufficiency of the evidence to support a guilty verdict, we look at the evidence in the light most favorable to the verdict and accept as established all reasonable inferences supporting the verdict." *United States v. Augustine*, 663 F.3d 367, 373 (8th Cir. 2011) (quotations and citations omitted). We "review[] de novo [the] district court's denial of a motion for judgment of acquittal"; however, "we review a challenge to the sufficiency of the evidence deferentially and affirm if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quotations, alterations, and citations omitted).

-17-

The jury convicted Vega of possession with intent to distribute five grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1). Vega does not dispute that he "possessed" methamphetamine on January 22, 2010. Instead, he argues that he did not "intend to distribute" the 8.6 grams of methamphetamine found in his garage. "With respect to the intent to distribute element, circumstantial evidence such as drug quantity, packaging material, and the presence of cash may be used to establish intent to distribute." *United States v. Finch*, 630 F.3d 1057, 1061 (8th Cir. 2011) (quotation, alteration, and citation omitted). "In the present case, an intent to distribute may easily be inferred from the evidence." *Id*. First, as to drug quantity, Vega admitted at trial to possessing the 8.6 grams of methamphetamine. Officer Lang testified that, based on his past experience, he had never "encountered someone who bought 8.6 grams of ice methamphetamine for their personal use." He also explained that, in January 2010, that amount of methamphetamine would have sold for between "[$]800 and $900." Second, Vega possessed packaging material—the "small zip-lock bags with the ace of spades designs"—which was consistent with the packaging material used in the January 12, 2010 drug transaction between Horvath and Vega. Third, "[p]olice also found . . . a digital scale in the [residence]," which is probative of intent to distribute. *Id*. (citing *United States v. Boyd*, 180 F.3d 967, 981 (8th Cir.1999) (relying in part on the presence of a scale as probative of intent to distribute)). Fourth, Horvath testified that Vega sold him methamphetamine on prior occasions, including on January 12, 2010. *See id*. (citing *United States v. McClellon*, 578 F.3d 846, 856 (8th Cir. 2009) (relying in part on testimony of defendant's "past conduct in selling drugs" as probative of intent to distribute)).[2] Accordingly, we hold that sufficient evidence exists to sustain the jury's verdict and that the district court did not err in denying the motion for judgment of acquittal.

---

[2]To the extent that Vega argues that the district court erroneously permitted the jury to consider the acquitted conduct, we have already rejected this argument. *See supra* Part II.B.

## 2. *New Trial*

Vega also argues that the district court erred in denying his motion for a new trial because he "was unfairly prejudiced by the introduction of evidence for which he had previously been acquitted."

Federal Rule of Criminal Procedure 33(a) provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." "The district court has broad, but limited, discretion to grant or deny a motion for a new trial based on the sufficiency of the evidence, and 'it can weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict.'" *United States v. Aguilera*, 625 F.3d 482, 486 (8th Cir. 2010) (quoting *United States v. Campos*, 306 F.3d 577, 579 (8th Cir. 2002)). But "[m]otions for new trial based on the sufficiency of the evidence are generally disfavored, . . . and '[u]nless the district court ultimately determines that a miscarriage of justice will occur, the jury's verdict must be allowed to stand.'" *Id.* at 487 (last alteration in original) (quoting *Campos*, 306 F.3d at 579).

We hold that the district court did not abuse its discretion in denying Vega's motion for new trial because, as previously discussed, the evidence of the January 12, 2010 drug transaction was admissible under Federal Rule of Evidence Rule 404(b). *See supra* Part II.B.

## D. *Sentencing*

"[Vega] argues the district court erred by enhancing his sentence for obstruction of justice and not reducing his sentence for acceptance of responsibility. We review the district court's factual findings for clear error and its application of the guidelines to those facts de novo." *United States v. Smith*, 665 F.3d 951, 955 (8th Cir. 2011) (quotation, alteration, and citation omitted).

## 1. *Obstruction of Justice*

"We first consider [Vega's] claim that the district court erred by applying Guidelines § 3C1.1 for 'Obstructing or Impeding the Administration of Justice.'" *Id*. Vega argues that the district court erroneously applied U.S.S.G. § 3C1.1 based on Vega's testimony that he was not *Mirandized* and did not intend to sell the methamphetamine found in his garage. According to Vega, his statements concerning Officer Branch's alleged failure to provide a *Miranda* warning could have been the result of confusion, mistake, or faulty memory in light of his drug abuse at the time and the general state of excitement and confusion that existed during the execution of the search warrant. Vega argues that his trial testimony does not constitute an obstruction of justice because (1) it was the government, not Vega, who brought up the subject of Officer Branch reading Vega his *Miranda* rights; (2) Vega's trial testimony concerning the drugs actually incriminated Vega because personal use of drugs is a felony under Nebraska law; and (3) Vega admitted at trial that his prior statements under oath denying possession of the drugs at the suppression hearing were misleading because he wanted to conceal his methamphetamine use from his family and loved ones.

Section 3C1.1 of the U.S.S.G. provides that

> [i]f (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

"A district court may apply the enhancement for obstruction of justice only if it finds by a preponderance of the evidence the defendant engaged in the relevant conduct." *Smith*, 665 F.3d at 955.

Both at trial and during the suppression hearing, Vega claimed that he was not read his *Miranda* rights. By contrast, Officer Branch testified that he did, in fact, read Vega his *Miranda* rights. And, contrary to Vega's testimony, both Officer Branch and Officer Noonan testified that they never threatened Vega in any way.

Vega also testified at trial that he never sold drugs. But Vega was caught with approximately nine grams of 80-percent pure methamphetamine that he claimed was for personal use. Vega was also found in possession of drug baggies and a drug scale. Officer Lang estimated that the methamphetamine was worth between $800 and $900 and not an amount purchased for personal use. Officer Lang also testified that it was common for heavy methamphetamine users to sell the drug to support the habit. Additionally, Horvath confirmed that Vega had sold him methamphetamine.

Based on the "the district court's superior position from which to judge credibility" and "ample proof that [Vega possessed the methamphetamine] for reasons other than those he declared at trial" and lied about not receiving *Miranda* warnings, we hold that the district court did not clearly err "in assessing an obstruction-of-justice enhancement." *United States v. Mabie*, 663 F.3d 322, 334–35 (8th Cir. 2011) (quotation and citation omitted).

## 2. *Acceptance of Responsibility*

"[Vega] also asserts the district court erred by failing to apply the two-level sentencing reduction for acceptance of responsibility." *Smith*, 665 F.3d at 957. Vega argues that he did accept responsibility for the methamphetamine in question, as he admitted to a felony under Nebraska law during his testimony. Furthermore, Vega asserts that his claim that he was not read his *Miranda* rights is of no consequence in determining whether he accepted responsibility.

"Whether the defendant accepted responsibility is a factual question that depends largely on credibility assessments made by the sentencing court. This Court

gives great deference to the district court's denial of a request for a reduction for acceptance of responsibility and reviews the decision for clear error.*" United States v. Ayala*, 610 F.3d 1035, 1036 (8th Cir. 2010) (per curiam) (quotation and citation omitted). "Under U.S.S.G. § 3E1.1(a), the burden is on a defendant to show that he clearly demonstrated acceptance of responsibility." *Smith*, 665 F.3d at 957 (quotations, alteration, and citation omitted). "An enhancement for obstruction of justice 'ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct.'" *United States v. Hull*, 646 F.3d 583, 588 (8th Cir. 2011) (quoting U.S.S.G. § 3E1.1 cmt. 4).

Here, the district court did not err in applying the obstruction-of-justice enhancement for testifying falsely in denial of his culpability; applying the general rule, application of this enhancement means that Vega has not accepted responsibility. Vega has not shown extraordinary circumstances indicating that "both §§ 3C1.1 and 3E1.1 . . . apply." U.S.S.G. § 3E1.1 cmt. 4.

## III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____